[982 NE2d 1227, 959 NYS2d 94]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v TAYDEN TOWNSLEY, Appellant.

Argued October 18, 2012; decided November 27, 2012

**POINTS OF COUNSEL**

*Law Offices of Joel B. Rudin*, New York City (*Joel B. Rudin* of counsel), for appellant. Appellate counsel's failure to raise

three clearly meritorious issues, one of which he inexcusably failed even to perceive, in favor of issues he knew would be unsuccessful, violated appellant's constitutional right to the effective assistance of counsel. (*Strickland v Washington*, 466 US 668; *People v Baldi*, 54 NY2d 137; *People v Stultz*, 2 NY3d 277; *Evitts v Lucey*, 469 US 387; *Ramchair v Conway*, 601 F3d 66; *People v Droz*, 39 NY2d 457; *Murray v Carrier*, 477 US 478; *People v Caban*, 5 NY3d 143; *People v Jenkins*, 68 NY2d 896; *People v Rivera*, 71 NY2d 705.)

*James R. Farrell, District Attorney*, Monticello (*Bonnie M. Mitzner* and *Eamonn Neary* of counsel), for respondent. Appellant was not denied effective assistance of appellate counsel and the Appellate Division properly denied his application for coram nobis relief. (*People v Baldi*, 54 NY2d 137; *People v Benevento*, 91 NY2d 708; *People v Ellis*, 81 NY2d 854; *People v Berroa*, 99 NY2d 134; *People v Henry*, 95 NY2d 563; *People v Hobot*, 84 NY2d 1021; *People v Rivera*, 71 NY2d 705; *People v Satterfield*, 66 NY2d 796; *People v Modica*, 64 NY2d 828; *People v LaBree*, 34 NY2d 257.)

**OPINION OF THE COURT**

SMITH, J.

In this proceeding for a writ of error coram nobis, defendant claims that he was deprived of the effective assistance of appellate counsel in an earlier appeal. Specifically, he claims appellate counsel was at fault for failing to argue, on appeal, that the conduct of the prosecutor at trial subjected defendant's trial lawyers to ethical conflicts and thereby deprived defendant of the effective assistance of trial counsel. We hold that defendant has failed to demonstrate that his appellate counsel was ineffective.

I

Defendant was convicted in 1995 of murder, attempted murder, assault and weapons offenses after a trial in which witnesses testified that he shot two members of a rival drug gang, killing one and wounding the other. The theory of the defense at trial was that the "real killer" was not defendant, but the leader of defendant's gang, Simeon Nelson, known as "Sims," who, according to several witnesses' testimony, was present when the shootings took place. Nelson did not testify at trial. Defendant's request for a missing witness instruction was denied, but defense counsel made a missing witness argument

in summation: "Simeon Nelson, who you didn't hear from, sits in the catbird seat this afternoon."

The principal issues now before us arise from defense counsel's effort to interview Nelson before trial, and the prosecutor's attempts to use that effort to the People's advantage. On cross-examination of defendant, the prosecutor established that, after the shootings, defendant and Nelson were incarcerated in the same jail at the same time. The prosecutor asked defendant if he and his lawyers had met with Nelson on the morning of the first day of trial. Defendant acknowledged that he had seen his lawyers meeting with Nelson that day, but denied that he had attended the meeting. Commenting in summation on this line of questioning by the prosecutor, defense counsel told the jury sarcastically: "Well, I'm sorry that the lawyers for [defendant] wanted the real killer to come forward."

In the People's summation, the prosecutor made the following comments about the meeting between Nelson and defense counsel:

> "I went and found out about their little secret meeting on April 25th. The Defendant didn't know that I knew, and he tried to backtrack and he tried to get flustered, and now the Defense lawyer told you it's his duty and obligation to try to talk to the real killer.
>
> "Is there any testimony by anyone in this trial that they spoke to Sims and confronted him? No. No lawyer for Legal Aid got on the stand and testified. You have no evidence . . . that they confronted Sims.
>
> "No, they had their little meeting with Sims to see if he would help them save their client, say it wasn't him, say it was somebody else, give us some information that could get our boy and your friend off."

Defense counsel did not object either to the prosecutor's questions about the jailhouse meeting or the argument based on it. Nor did defendant's appellate counsel raise any issue relating to those questions or comments on the direct appeal from defendant's conviction and sentence.

The Appellate Division affirmed on direct appeal (*People v Townsley*, 240 AD2d 955 [3d Dept 1997]). Some 12 years later, defendant moved under CPL 440.10 to set aside his conviction,

arguing among other things that the prosecutor had accused defense counsel of trying to fabricate a defense, with the result that defendant was deprived of his right to conflict-free counsel. County Court denied the CPL 440 motion, in part on the ground that the issue could have been raised on direct appeal. After the Appellate Division denied leave to appeal from the denial of the CPL 440 motion, defendant began the present coram nobis proceeding in the Appellate Division (*see People v Bachert*, 69 NY2d 593 [1987]), arguing that appellate counsel was ineffective for failing, among other things, to raise the conflict issue.

The Appellate Division denied coram nobis relief (2011 NY Slip Op 64401[U] [2011]). A Judge of this Court granted leave to appeal (17 NY3d 956 [2011]), and we now affirm.

## II

Defendant's principal argument proceeds in several stages. He argues that the prosecutor's trial tactics created ethical problems for defendant's trial counsel, who, according to defendant's present argument, were put in a position where they should have called themselves as witnesses, and were also personally accused of wrongdoing. These problems, defendant argues, should have led the trial court to conduct an inquiry and, unless the conflicts were validly waived, to disqualify trial counsel. The court's error in failing to proceed in this way, the argument continues, was so clear that appellate counsel's failure to argue it on appeal amounted to ineffective assistance of counsel.

The ultimate question raised by this argument is whether appellate counsel was ineffective. In addressing that question, we examine the merits of the underlying claim that trial counsel was conflicted, but in doing so we must remember that appellate counsel's omission of claims from his appellate brief "should not be second-guessed with the clarity of hindsight" (*People v Benevento*, 91 NY2d 708, 712 [1998]). The constitutional requirement of effective assistance of counsel is met where "the attorney provided meaningful representation" (*People v Baldi*, 54 NY2d 137, 147 [1981]). Appellate lawyers "have latitude in deciding which points to advance" and need not "brief or argue every issue that may have merit" (*People v Stultz*, 2 NY3d 277, 285 [2004]). In reviewing the performance of appellate counsel, "the minimum standard of performance required . . . is a very tolerant one" (*People v Turner*, 5 NY3d 476, 480 [2005]). Viewing the case in that light, we conclude that appellate counsel was not ineffective.

Defendant first contends that his lawyers were subject to a "conflict" because the prosecutor's questioning and argument about defense counsel's meeting with Nelson made the defense lawyers into necessary witnesses at trial. This argument lacks merit.

The word "conflict" does not fully describe what is sometimes called the "advocate-witness" problem. A lawyer who is both an advocate and witness does not necessarily have conflicting interests, though that possibility exists. But whether or not there is a conflict, such a mixture of roles may confuse the fact-finder and impair the fairness of the trial, and a lawyer is ethically required, subject to certain exceptions, to withdraw from a representation when he or she (in the words of the ethical rule as it existed when defendant was tried) "learns or it is obvious that the lawyer ought to be called as a witness on behalf of the client" (former Code of Professional Responsibility DR 5-102 [a] [22 NYCRR 1200.21 (a)]; cf. Rules of Professional Conduct [22 NYCRR 1200.0] rule 3.7 [a] [current, similar provision]). One of the exceptions—where withdrawal "would work a substantial hardship on the client because of the distinctive value of the lawyer as counsel in the particular case" (Code of Professional Responsibility DR 5-101 [b] [4] [22 NYCRR 1200.20 (b) (4)]; cf. Rules of Professional Conduct [22 NYCRR 1200.0] rule 3.7 [a] [3])—might be relevant here, but the point is moot because a reasonable appellate counsel could well have concluded that the trial lawyers did not need to be called as witnesses at all.

■ The mere fact that defendant's lawyers had met with Nelson, and that the jury knew of the meeting, did not make it either necessary or appropriate for the lawyers to testify. The prosecutor presumably brought out the meeting to show that Nelson, whom the defense portrayed as a missing witness, was not wholly in the People's control—a legitimate, if peripheral, point that the testimony of defense counsel could hardly have refuted. Nothing in the record indicates that the defense lawyers could have said anything about the meeting that would have helped their client. It would no doubt be different if they could have testified that Nelson told them he committed the crimes, but there is no evidence that he told them anything of the kind.

Defendant's second argument deserves more attention. It is, in substance, that the prosecutor accused the defense lawyers of criminal wrongdoing—of attempting to get Nelson to tell a false story that would exculpate the lawyers' client. Such an accusation, while it would not automatically require disqualification,

would create at least a potential for conflict; when a lawyer's own conduct is in question, the lawyer may be impelled to protect himself at his client's expense (*see* Code of Professional Responsibility DR 5-101 [a] [22 NYCRR 1200.20 (a)]: "[A] lawyer shall not accept employment if the exercise of professional judgement on behalf of the client will be or reasonably may be affected by the lawyer's own . . . personal interests" [*cf.* Rules of Professional Conduct (22 NYCRR 1200.0) rule 1.7 (a) (2)]; *see also e.g. People v Konstantinides*, 14 NY3d 1 [2009]; *United States v Fulton*, 5 F3d 605 [2d Cir 1993]). In this case, however, defendant's appellate lawyer could reasonably have concluded that the record did not show that any such accusation was made.

The prosecutor's cross-examination of defendant about his lawyers' meeting with Nelson contained no suggestion of wrongdoing by defense counsel. It showed only that they had met with a possible witness—i.e., that they were doing their job. The prosecutor's remarks about the meeting in closing argument are more troublesome. It was entirely inappropriate for the prosecutor to refer to the defense lawyers' "little secret meeting" with Nelson and to suggest that their purpose was "to see if he would help them save their client, say it wasn't him, say it was somebody else . . . get our boy and your friend off." The argument suggested to the jury that there was something improper in a lawyer's interviewing a witness in the hope of getting favorable testimony. That is not in the least improper. It is what good lawyers do.

Thus, the prosecutor's closing argument warranted a rebuke from the trial judge. A reasonable appellate counsel could have concluded, however, that it warranted nothing more—specifically, that it did not warrant interrupting the trial to inquire whether defense counsel could still exercise independent judgment, and if not whether defendant would waive any conflict. It would have been reasonable for appellate counsel to conclude that a reversal based on the trial court's failure to make such an inquiry was highly unlikely.

■ The prosecutor's closing argument did not say, and could reasonably be read not to imply, that the defense lawyers asked Nelson to give *false* testimony. Subornation of perjury is a serious crime, of course, but it hardly seems likely that the trial lawyers in this case should have believed, or did believe, that they were in danger of investigation or prosecution for committing it. In other cases in which the issue of defense counsel's

personal culpability has been raised, the lawyers seemed to have much more serious problems. In *Konstantinides*, a witness specifically claimed that a defense lawyer asked her to lie (14 NY3d at 6); in *Fulton*, a witness had told prosecutors "that he had once imported heroin for Fulton's trial counsel" (5 F3d at 606).

In this case, the prosecutor's comments about defense counsel were far less specific. Trial counsel, and a reasonable appellate counsel reviewing the record, could well have taken them as nothing more than an obnoxious, but essentially irrelevant, way of describing a defense lawyer's legitimate activity. Now, in this coram nobis proceeding, defendant makes a perhaps plausible argument that the prosecutor's remarks were more than that, but we do not find the argument "so compelling that a failure to make it amounted to ineffective assistance of counsel" (*People v Carter*, 7 NY3d 875, 877 [2006]).

Defendant's remaining arguments do not require long discussion. While a few of the prosecutor's other remarks on summation may have been objectionable, they were of minor importance. Appellate counsel was not ineffective because he chose not to make an issue of them on appeal.

Accordingly, the order of the Appellate Division should be affirmed.

CIPARICK, J. (dissenting). I believe defendant is entitled to coram nobis relief as he has demonstrated that he was denied effective assistance of appellate counsel due to counsel's failure to argue on direct appeal that defendant's trial counsel was ineffective. Thus, I respectfully dissent.

## I.

In June 1995, defendant was convicted of second degree murder, first degree assault, two counts of first degree criminal use of a firearm and two counts of second degree criminal possession of a weapon stemming from the fatal shooting of Lynell James and the wounding of Johmar Brangan.

The following facts were adduced at trial. In 1994, defendant worked as a courier in a low-level drug ring in South Fallsburg, New York led by Simeon Nelson, known as "Sims" or "Sim" (hereinafter Nelson or Sims). The ring conducted crack cocaine sales out of the apartment of Barbara Slater. On July 1, 1994, James was shot in the back of the head inside Slater's apartment and Brangan was shot in the mouth and arm in the

hallway outside of the apartment. Police arrested defendant, whom witnesses identified as the assailant, 12 days later. Several of the People's eyewitnesses, including Slater and Brangan, placed both defendant and Nelson at the scene of the shootings but named defendant as the assailant.

Defendant's theory of the case was that Nelson shot James and Brangan and that the People's witnesses accused defendant in fear of Nelson. Defendant testified that he fled after witnessing the shootings and hid after learning from his brother that witnesses named him as the perpetrator. During defendant's cross-examination, the prosecutor sought to establish that defendant and his attorneys met with Nelson on the eve of trial to gain Nelson's acquiescence to the defense's strategy of shifting the blame to him. The prosecutor asked defendant, "Isn't it true that because Sims is your friend, you wanted to clear it with him . . . , like when I go to trial I'm going to say that you did it so that I can get off, but don't you be mad at me[?]" Defendant denied the allegation, stating that his attorneys instructed him not to discuss the case with anyone. The prosecutor then asked defendant whether he and his lawyers had a "get-together" at the jail with Nelson, "the same [person] . . . who you say committed the murder, not you[?]" Defendant responded that his lawyers met with Nelson, and that Nelson left within minutes of defendant's entry into the meeting. There is no indication from the record that either counsel or the court had any discussion with defendant regarding whether the prosecutor's cross-examination created a conflict for defense counsel.

During summation, defense counsel attempted to rebut the prosecutor's insinuation, stating, "I'm sorry that the lawyers for Tayden wanted the real killer to come forward . . . I'm sorry that Tayden's lawyers confronted Sim so that he would come clean." During the People's summation, the prosecutor responded:

> "Is there any testimony by anyone in this trial that they spoke to Sims and confronted him? No. No lawyer for Legal Aid got on the stand and testified. You have no evidence, evidence, that they confronted Sims . . .

> "So, don't get fooled by that kind of argument about . . . how their meeting with Sims was to confront the murderer."

The prosecutor also made various statements about the veracity of defendant's testimony. The prosecutor told the jurors, "For [defendant] to tell you that he carried no grudge [against Nelson] is a blatant lie," and that it was "reason enough to disregard everything that he has to say . . . as a total fabrication." Additionally, the prosecutor repeatedly described defendant as a self-proclaimed "altar boy" and, sarcastically, as a "family man" and "paragon of virtue." Moreover, in explaining that the People were not required to establish a motive for the crime, the prosecutor referred to the Oklahoma City bombings, which had taken place the week prior to closing arguments, stating: "Why did somebody blow up the building in Oklahoma? Does any motive make sense. Of course not. Can you give a logical reason for such a horrible illogical act? Of course not." With one exception, defense counsel did not object to these remarks. Finally, the prosecutor instructed the jury that it was not necessary to consider the charges, stating:

> "The charges here don't matter anymore because the Defendant says he didn't do it. He didn't say the crimes weren't committed . . .

> "If the gun is in the Defendant's hand, then he's guilty of every crime charged, every crime. You don't have to decide what was his state of mind, what did he intend to do, what did he really mean to do, because that's conceded . . .

> "So, the criminal charges now you don't really have to deliberate very much over."

Defendant was convicted and sentenced to 37½ years to life in prison. On direct appeal, defendant was represented by court-appointed appellate counsel who raised several grounds for reversal but did not challenge trial counsel's effectiveness. The Appellate Division affirmed the conviction (*People v Townsley*, 240 AD2d 955 [3d Dept 1997], *lv denied* 90 NY2d 943 [1997]). Thereafter, defendant's pro se habeas corpus petition was denied (*Townsley v Portuondo*, 99 Civ 02476 [SD NY 2002]). In 2009, defendant moved to vacate his conviction under CPL 440.10, arguing that his trial counsel was conflicted and rendered ineffective assistance. County Court denied the motion on the ground that the claims should have been asserted on defendant's direct appeal. In 2011, defendant petitioned for a writ of error coram nobis. In support of the petition, defendant submitted an affirmation from his former appellate counsel, who

stated that "[a]t the time of Townsley's appeal, [he] did not make any professional judgment not to raise the conflict issue" and "did not perceive the conflict of interest issue." Counsel also stated that he "[could] not recall [his] thought process in connection with the omission from Townsley's appellate brief of any ineffective assistance of trial counsel claims." The Appellate Division denied defendant's petition without opinion (2011 NY Slip Op 64401[U] [2011]). A Judge of this Court granted defendant leave to appeal (17 NY3d 956 [2011]) and the majority now affirms that order.

## II.

Criminal defendants "have a federal and state constitutional right to effective assistance of appellate counsel" (*People v Stultz*, 2 NY3d 277, 282 [2004]; *see People v Borrell*, 12 NY3d 365, 368 [2009]). Appellate advocates are held to the same standard of "meaningful representation" established in *People v Baldi* (54 NY2d 137, 147 [1981]) to evaluate the efficacy of trial counsel (*see Stultz*, 2 NY3d at 284 [explaining that it would be "inapt to have one standard for trials and another for appeals"]). A defendant claiming that he was not afforded meaningful representation "must demonstrate the absence of strategic or other legitimate explanations for counsel's allegedly deficient conduct" (*People v Caban*, 5 NY3d 143, 152 [2005] [internal quotation marks omitted]). "Absent such a showing, it will be presumed that counsel acted in a competent manner and exercised professional judgment" (*People v Rivera*, 71 NY2d 705, 709 [1988]).

We have clarified the *Baldi* standard as applied to appellate counsel, stating:

> "Appellate advocacy is meaningful if it reflects a competent grasp of the facts, the law and appellate procedure, supported by appropriate authority and argument. Effective appellate representation by no means requires counsel to brief or argue every issue that may have merit. When it comes to the choice of issues, appellate lawyers have latitude in deciding which points to advance and how to order them" (*Stultz*, 2 NY3d at 285).

"The essential inquiry in assessing the constitutional adequacy of appellate representation is, then, not whether a better result might have been achieved, but whether, viewed objectively,

counsel's actions are consistent with those of a reasonably competent appellate attorney" (*Borrell*, 12 NY3d at 368).

Applying these standards, we have "recognize[d] that in making appellate arguments, attorneys must evaluate the performance of trial counsel and, when appropriate, raise claims of ineffective representation" (*Stultz*, 2 NY3d at 287). In *People v Turner* (5 NY3d 476 [2005]), for example, we declared an appellate attorney's representation deficient where, despite an otherwise competent performance, the attorney elected not to argue that trial counsel was ineffective in failing to argue that the charge of manslaughter was time-barred (*see id.* at 480-481). We concluded that because the statute of limitations defense "was a winning argument[,] trial counsel could not reasonably have thought that the defense was not worth raising; [therefore,] appellate counsel could not reasonably have thought that she should not argue trial counsel's ineffectiveness" (*id.* at 481).

Here, defendant contends his appellate counsel was ineffective in failing to raise the issue that defendant's trial counsel labored under a conflict of interest and was otherwise ineffective in failing to object to the prosecutor's inflammatory statements. Consistent with *Turner*, the question of appellate counsel's effectiveness depends on the strength of defendant's underlying claims regarding his trial counsel's allegedly deficient performance (*see* 5 NY3d at 481).

It has long been established that constitutionally adequate criminal representation must be "conflict-free and singlemindedly devoted to the client's best interests" (*People v Ennis*, 11 NY3d 403, 409-410 [2008], quoting *People v Harris*, 99 NY2d 202, 209 [2002]; *see also People v Ortiz*, 76 NY2d 652, 657 [1990]). "Initially it is defense counsel's burden to recognize the existence of a potential conflict of interest, to alert both the client and the court to the potential risks involved, and to obtain the client's informed consent to counsel's continued representation despite those risks" (*People v McDonald*, 68 NY2d 1, 8 [1986]; *see People v Wandell*, 75 NY2d 951, 952 [1990]; *People v Lloyd*, 51 NY2d 107, 111 [1980]). When a defendant claims on appeal that his or her trial counsel's representation was compromised by a conflict of interest the court must conduct a two-part inquiry to determine first whether a conflict of interest exists, and second, whether the conflict operated on the representation (*see People v Konstantinides*, 14 NY3d 1, 10 [2009]; *Ennis*, 11 NY3d at 410; *Ortiz*, 76 NY2d at 657).

Defendant argues that his trial counsel became conflicted under the "advocate-witness" rule because the prosecutor insinuated during defendant's cross-examination that the lawyers colluded with Nelson and defendant to concoct a false defense, creating a need for the lawyers to testify regarding the true nature of their meeting with Nelson. In my view, that would have been a winning argument on direct appeal.

"Recognizing that the roles of an advocate and of a witness are inconsistent," the ethical rules governing the practice of law "direct[ ] that a lawyer who *ought to be called* as a witness on behalf of his client shall withdraw from the conduct of the trial" (*S & S Hotel Ventures Ltd. Partnership v 777 S. H. Corp.*, 69 NY2d 437, 444 [1987], citing former Code of Professional Responsibility DR 5-102 [a]; DR 5-105 [a] [former 12 NYCRR 1200.21 (a); 1200.24 (a) (repealed eff Apr. 1, 2009)]).[1] Accordingly, a lawyer whose testimony is likely to be necessary will be disqualified, with necessity measured by "such factors as the significance of the matters, weight of the testimony, and availability of other evidence" (*id.* at 446).

The majority rejects defendant's claim, holding that "[t]he mere fact that defendant's lawyers had met with Nelson, and that the jury knew of the meeting, did not make it either necessary or appropriate for the lawyers to testify" (majority op at 299). However, the prosecutor's cross-examination did not merely elicit that a meeting took place. The prosecutor sought to bring out that "because Sims is [defendant's] friend" defendant wanted to "clear . . . with him" that he was going to blame Sims for the shootings so that he "c[ould] get off." What immediately followed were questions to establish that defendant and his attorneys met with Nelson on the eve of trial: "[D]id you not have a get-together with you and Simeon Nelson and your lawyers, on the morning of April 25th, for an hour and a half, at the Sullivan County Jail[?] . . . the same Simeon Nelson . . . who you say committed the murder, not you[?]" In my view, the clear import of that line of questioning was to insinu-

---

1. The Rules of Professional Conduct currently provide that "[a] lawyer shall not act as advocate before a tribunal in a matter in which the lawyer is likely to be a witness on a significant issue of fact unless . . . (1) the testimony relates solely to an uncontested issue; (2) the testimony relates solely to the nature and value of legal services rendered in the matter; or (3) disqualification of the lawyer would work substantial hardship on the client" (Rules of Professional Conduct [22 NYCRR 1200.0] rule 3.7 [a]).

ate that the purpose of the meeting was to gain Nelson's cooperation in a fabricated theory of defense and that the lawyers played an active role in that scheme.[2]

Because the entire theory of defense was that Nelson, rather than defendant, was the perpetrator, the People's suggestion that the defense was manufactured with Nelson's participation was highly significant. The majority opines, however, that "[n]othing in the record indicates that the defense lawyers could have said anything about the meeting [in testimony] that would have helped their client" (majority op at 299). I disagree. If that were truly the case, defense counsel would not have felt compelled to attempt to repair the damage by asserting in summation that the attorneys "confronted Sim so that he would come clean" and to get "the real killer to come forward." That the attorneys' sworn testimony was necessary to address the People's accusation is made plain by the prosecutor's remark that "[n]o lawyer for Legal Aid got on the stand and testified. You have no evidence, evidence, that they confronted Sims."

Despite this indication that defense counsel became conflicted under the advocate-witness rule, nothing in the record shows that the attorneys alerted the court or defendant to the existence of the conflict, or that the court undertook any inquiry into whether defendant knew the risks of continuing with his current representation and had waived those risks (*see McDonald*, 68 NY2d at 8). Given that the court failed to obtain defendant's knowing, voluntary waiver of the conflict, appellate counsel would only have had to demonstrate that the conflict operated on the defense in order to obtain a reversal of defendant's conviction (*see Ortiz*, 76 NY2d at 657). That standard could have been met in light of defense counsel's attempt in summation to rebut the People's allegations in what can fairly be categorized as their unsworn testimony.

The potency of this conflict as grounds for reversal "should have been apparent to any reasonable appellate counsel, and should have prompted that counsel to make an ineffective assistance argument" (*Turner*, 5 NY3d at 483). Indeed, appellate counsel's affirmation that he "did not make any professional

---

**2.** For this same reason, I cannot agree with the majority's assertions—rejecting defendant's additional claim that his counsel became conflicted by the prosecutor's allegation of criminal wrongdoing—that the cross-examination "contained no suggestion of wrongdoing by defense counsel" and that "defendant's appellate lawyer could reasonably have concluded that the record did not show that any such accusation was made" (majority op at 300).

judgment not to raise the conflict issue" and, in fact, "did not perceive the conflict of interest issue," demonstrates that his conduct lacked any strategic basis (*see Rivera*, 71 NY2d at 709). To be sure, appellate counsel drafted a thorough brief, raising six grounds for reversal and challenging the severity of defendant's sentence. However, because conflict-free representation is nothing short of fundamental, I find appellate counsel's failure to raise trial counsel's ineffectiveness "so egregious and prejudicial as to [have] deprive[d] . . . defendant of his constitutional right" to meaningful appellate advocacy (*Turner*, 5 NY3d at 480 [internal quotation marks omitted]).

The omission of that argument on defendant's direct appeal is all the more glaring when one considers trial counsel's failure to object to numerous questionable remarks during the People's summation. Specifically, defendant points to the prosecutor's many comments on witness credibility, including his characterization of defendant's testimony about his personal feelings toward Nelson—evidence of which could only come from defendant—as a "blatant lie" that should prompt the jury to "disregard everything that [defendant] has to say." Defendant also cites the prosecutor's efforts to assail defendant's character (including repeated sarcastic references to defendant as an "altar boy"), his attempt to draw a parallel to the recent terrorist attack in Oklahoma City, and, perhaps most egregious, his instruction to the jury to disregard the elements of the charged offenses.

Under our relevant precedents, defendant's trial counsel had clear bases for objecting to these inflammatory statements (*see People v Bailey*, 58 NY2d 272, 277 [1983] ["(A) prosecutor may not, either in the course of closing argument or even in a less argumentative trial context, express his or her personal belief or opinion as to the truth or falsity of any testimony or evidence"] [internal quotation marks omitted]; *People v Wright*, 41 NY2d 172, 175 [1976] [condemning the prosecutor's remarks regarding the defendant's character as improper and "not fairly inferrable from the evidence"]; *People v Flynn*, 79 NY2d 879, 881-882 [1992] [declaring it "well settled that all the elements of an indicted crime which are not conceded by defendant or defendant's counsel must be charged" to the jury]). The attorneys' reticence in the face of this prejudicial rhetoric is not as clear-cut a basis for a finding of ineffectiveness as their apparent conflict; nonetheless, it only enhances what a reasonable appellate attorney should have identified as defendant's winning ineffectiveness claim.

Accordingly, I would reverse the order of the Appellate Division and grant the coram nobis relief defendant seeks.

Judges GRAFFEO, READ and PIGOTT concur with Judge SMITH; Judge CIPARICK dissents and votes to reverse in a separate opinion in which Chief Judge LIPPMAN concurs.

Order affirmed.