[901 NYS2d 582]

DAVID STRACHMAN, as Administrator of the Estate of YARON UNGAR, Deceased, et al., Respondents, v THE PALESTINIAN AUTHORITY et al., Defendants, and THE PALESTINIAN PENSION FUND FOR THE STATE ADMINISTRATIVE EMPLOYEES OF THE GAZA STRIP, Appellant.

First Department, March 30, 2010

### APPEARANCES OF COUNSEL

*Morrison & Foerster LLP*, New York City (*Charles L. Kerr, Mark David McPherson* and *Adam Jackson Heintz* of counsel), for appellant.

*Jaroslawicz & Jaros, LLC*, New York City (*Robert J. Tolchin* of counsel), for respondents.

### OPINION OF THE COURT

CATTERSON, J.

The sole issue in this appeal is whether the plaintiffs, judgment creditors of the Palestinian Authority (hereinafter referred to as PA) and the Palestine Liberation Organization (hereinafter referred to as PLO), have a right to a jury trial in a declaratory judgment action. The action seeks to establish the PA's ownership of more than $100 million in securities and debt instruments frozen by Swiss American Securities Inc., (hereinafter referred to as SASI) in New York. Thus, as set forth below, this Court's task is to find an 1894 analog for a claim of money-laundering designed to interfere with the execution of a judgment.

The plaintiffs are the survivors and the administrator of the estate of United States citizen Yaron Ungar, who was murdered with his pregnant wife in a terrorist machine-gun attack in June 1996 in Israel. The plaintiffs alleged that the attack was carried out by members of Hamas acting under the command of the PA and the PLO. In July 2004, the plaintiffs obtained a default judgment against the PA and PLO in an amount of $116,409,123. (*See Estates of Ungar & Ungar ex rel. Strachman v Palestinian Auth.*, 325 F Supp 2d 15 [D RI 2004], *affd sub nom. Ungar v Palestine Liberation Org.*, 402 F3d 274 [1st Cir 2005], *cert denied* 546 US 1034 [2005].)

In 2005, the federal judgment was domesticated in New York. The federal court issued a restraining order and injunction, and the plaintiffs served information subpoenas and restraining notices pursuant to CPLR 5222 on a number of entities believed to be holding assets of the PA and the PLO. The notices stated that the federal injunction applied to all assets of the PA and the PLO "however titled." In response to the notice, SASI froze more than $100 million in accounts titled variously as the Palestinian Pension Fund for the State Administrative Employees and the Palestinian Pension Fund for the State Administrative Employees of the Gaza Strip.

On or about December 7, 2005, defendant, the Insurance and Pension Fund (hereinafter referred to as IPF), appeared for the first time and asserted that the names on the account are aliases of the IPF not the PA, and that IPF is an independent entity. IPF moved to vacate the restraining order. The plaintiffs did not respond but instead filed for a turnover proceeding against SASI, and filed a sheriff's levy coextensive with the proceeding. The plaintiffs further filed this declaratory judgment action seeking a declaration that the assets held by SASI belong to the PA not IPF, and alleging that the PA and the IPF engaged in a fraudulent scheme to prevent the Ungars from enforcing their judgment against the assets frozen by SASI.

In or around March 2006, the court deemed the motion to vacate the restraining notice moot in view of the fact that the plaintiffs had withdrawn it. IPF moved to dismiss the turnover proceeding and the court granted the motion.

Discovery in this declaratory judgment action was completed in February 2007, and the plaintiffs filed a corrected note of issue demanding a trial by jury on all issues. Four months later, on May 30, 2007, defendant Palestinian Pension Fund for the State Administrative Employees of the Gaza Strip (hereinafter referred to as the Gaza Fund) moved to strike the plaintiffs' demand for a jury trial.* By decision and order entered May 7, 2008, the court denied the defendant's motion to strike the jury demand. (2008 NY Slip Op 33602[U].)

---

* The plaintiffs take exception to the defendant naming itself the Palestinian Pension Fund for State Administrative Employees of the Gaza Strip in its motion to strike the jury trial demand, since they assert that defendant first appeared in the motion to vacate the restraining order as the Insurance and Pension Fund. Defendant explains in a footnote that it has used the "abbreviation" of Insurance and Pension Fund in papers filed in this action and

For the reasons set forth below, we affirm. CPLR 4101 provides for a jury trial in "an action in which a party demands and sets forth facts which would permit a judgment for a sum of money only" or in "any other action in which a party is entitled by the constitution or by express provision of law to a trial by jury." (CPLR 4101 [1], [3].)

The declaratory judgment action was unknown at the time of the adoption of the 1894 NY Constitution which "fr[o]ze" the right to a jury trial to those types of cases in which it was recognized at common law or by statute as of the adoption of the Constitution. (*See Independent Church of Realization of Word of God v Board of Assessors of Nassau County*, 72 AD2d 554, 554 [2d Dept 1979].)

However, the right to trial by jury is not limited to those instances in which it was used as of 1894 but extends to cases that are analogous to those which were traditionally tried by jury. (*Id.*, citing *Wynehamer v People*, 13 NY 378, 426 [1856] and *Colon v Lisk*, 153 NY 188, 193 [1897].) Hence, as the motion court correctly noted, it is necessary to examine which of the traditional common-law actions would most likely have been used to present the instant claim had the declaratory judgment action not been created. (*See* Siegel, NY Prac § 439 [4th ed]; *see also James v Powell*, 25 AD2d 1 [1st Dept 1966], *revd on other grounds* 19 NY2d 249 [1967].)

It then follows that if the traditional action that most likely would have been used is an action at law, then the plaintiffs will be entitled to a jury trial. (*See Matter of DES Mkt. Share Litig.*, 79 NY2d 299, 304-305 [1992].) If the traditional action that would have been presented is equitable, there is no right to a jury trial. (*Independent Church of Realization of Word of God*, 72 AD2d at 555.)

While the parties agree on the applicable standard, on appeal they disagree, as they did before the motion court, as to which traditional action would have been used instead of the instant declaratory judgment action. The defendant argues that this is essentially a "quiet title" claim and thus the action lies in equity because disputes concerning ownership of property including personal property such as securities were treated as equitable claims.

---

in related proceedings "rather than using its full and proper name." The plaintiffs are right that, by so doing, the defendant attempts to prejudge the very issue at the heart of this action, that is, whether the IPF and the Gaza Fund are legitimately interchangeable names.

The plaintiffs assert that the gravamen of their complaint is that the Gaza Fund is a fictitious name used by the judgment debtor PA to shield PA assets. More significantly, they allege that the IPF's claim that it owns the assets is false and an attempt to mislead the court and to unlawfully prevent the plaintiffs from enforcing their judgment against the PA. Thus, the plaintiffs argue that the motion court held correctly that the action is substantively analogous to an action at law for tortious interference with the enforcement of a judgment. We agree.

The plaintiffs further assert correctly that a cause of action for unlawful interference with enforcement of a judgment has long been recognized in New York, and that it was always an action triable by a jury. (*See Yates v Joyce*, 11 Johns 136 [1814] [party liable for damages after its fraudulent misconduct where plaintiff acquired a legal lien on a property and injury to property was done with a full knowledge of the plaintiff's rights]; *see also Quinby v Strauss*, 90 NY 664 [1882].) In *Quinby*, an action for damages was held maintainable against a judgment debtor and his attorney for conspiring to keep defendant's property out of the reach of his creditors by securing fictitious debts under which the property was sold to his attorney.

There is no question, therefore, that the cause of action existed at the time that the Constitution was enacted in 1894. Nor is there any doubt that the action was an action at law and thus triable by a jury. (*See Quinby*, 90 NY at 664-665.)

In *James v Powell*, this Court further explained:

> "At common law, whoever by improper means interfered with the execution of a judgment was liable for the damage he caused to the judgment creditor (*Mott* v. *Danforth*, 47 Pa. 304; *Collins* v. *Cronin*, 117 Pa. 35). The right of action [for unlawful interference with execution on a judgment] has been recognized and discussed at length by the United States Supreme Court in *Findlay* v. *McAllister* (113 U.S. 104) and is undoubtedly part of the common law of this State (*Quinby* v. *Strauss*, 90 N. Y. 664)" (25 AD2d at 2).

This Court then discussed the measure of damages for such an action:

> "In any event, this is neither a suit on the judgment nor for the same relief, and not even specifi-

cally to collect it. It is for damages resulting from a tort. The amount of the judgment is not the measure of the damages; it is rather the loss or expense caused by the interference (*Penrod* v. *Mitchell*, 24 Pa. 522). Conceivably, this could embrace the judgment itself (*see Quinby* v. *Strauss, supra*), in which event satisfaction of the judgment so obtained would also operate to satisfy the original judgment." (25 AD2d at 4; *see also Arrow Communication Labs. v Pico Prods.*, 219 AD2d 859 [4th Dept 1995] [the trial court properly denied defendant's motion to strike plaintiff's jury demand; although plaintiff sought equitable relief in the form of a declaratory judgment and an accounting, underlying controversy sought monetary damages]; *Hebranko v Bioline Labs.*, 149 AD2d 567 [2d Dept 1989] [plaintiff's allegation of facts upon which damages alone will afford full relief entitled him to jury trial notwithstanding inclusion of a request for equitable relief].)

We reject the dissent's contention that any reliance on *Quinby* is misplaced because the plaintiffs did not have any interest in the allegedly fraudulently "transferred" property at the time of the transfer. This position appears to amplify the equivocation of the court which, while concluding that the most analogous action here is tortious interference, nonetheless was compelled to recognize that "the alleged overall scheme was designed to hide the PA's and the PLO's assets for all purposes, and not solely to thwart execution of plaintiffs' judgment." (2008 NY Slip Op 33602[U], *5.)

The dissent relies on *Federal Deposit Ins. Corp. v Porco* (147 AD2d 422, 423 [1989], *affd* 75 NY2d 840 [1990]) for the proposition that a judgment creditor must have "a lien or other interest in fraudulently transferred property of his debtor in order to maintain an action for damages." The dissent therefore would reverse on the ground that, if the PA or PLO set up accounts like the Gaza Fund as aliases in a general scheme prior to the federal judgment, then the plaintiffs could not allege tortious interference because the alleged tortious "transfer" was effected before the judgment.

However, in our view, that misses the point of the plaintiffs' complaint. At the very heart of the declaratory judgment action is the question of whether the Gaza Fund is a fictitious account owned or controlled by the PA, or whether it is a synonym for

the IPF, which the plaintiffs acknowledge may be a separate juridical entity, and a legitimate pension fund.

Hence, in seeking a declaration that the PA not the IPF owns the assets, the plaintiffs are essentially seeking a declaration that the IPF's interjection into the suit, with its claim that it owns the assets held in the SASI accounts, was the tortious act of interference. Moreover, plaintiffs claim that the IPF's claim of ownership was specifically aimed at thwarting the plaintiffs' execution on the judgment since the IPF's interjection and fraudulent assertion occurred *after* the judgment in favor of the plaintiffs, and *after* the plaintiffs filed their restraining notices.

Finally, the court properly rejected defendant's contention that the action is analogous to a quiet title action. In every case cited by the defendant in support of its "quiet title" theory, the plaintiff or plaintiffs alleged an ownership claim to the property at issue, be it real property or securities. (*See Wright v Nostrand*, 94 NY 31 [1883]; *Cushman v Thayer Mfg. Jewelry Co.*, 76 NY 365 [1879]; *New York & New Haven R.R. Co. v Schuyler*, 17 NY 592 [1858].) Here the plaintiffs are in the shoes of a judgment creditor, rather than an alleged owner, and are asking for a judgment declaring a third party, codefendant PA, as the true owner of the securities held by SASI.

The defendant initially ignored the issue of plaintiffs not claiming ownership to the SASI securities. The court raised the issue, and defense counsel admitted at oral argument that the precedent on quiet title involved only parties who claimed ownership to the property at issue. The defendant was unable to cite a single "quiet title" action where the plaintiff sought a finding of ownership with respect to a third party. Further, on appeal, defendant did not address the issue either in its 31-page brief or even in its 17-page reply brief after the plaintiffs specifically raised this point. We find that this is not coincidental or a mere harmless omission.

Accordingly, the order of the Supreme Court, New York County (Shirley Werner Kornreich, J.), entered May 7, 2008, which, insofar as appealed from, denied the motion to strike plaintiffs' demand for a jury trial, should be affirmed, with costs.

TOM, J.P. (dissenting). In this declaratory judgment action, plaintiffs seek to satisfy a judgment obtained against defendant Palestinian Authority (PA) from funds held on behalf of the Pension Fund by a New York custodian, nonparty Swiss Ameri-

can Securities Inc. Pursuant to a federal injunction, Swiss American has frozen over $100 million in securities and debt instruments held in the Pension Fund's account.

Plaintiffs are the administrator and survivors of the estate of Yaron Ungar, who was murdered together with his wife in a June 9, 1996 terrorist machine-gun attack in Israel. Plaintiffs alleged that the attack was carried out by members of Hamas acting under the command of the PA and the Palestine Liberation Organization (PLO). On July 12, 2004, plaintiffs obtained a default judgment in the amount of $116,409,123 against those parties under the Antiterrorism Act of 1991 (18 USC § 2331 *et seq.*) (*Estates of Ungar & Ungar ex rel. Strachman v Palestinian Auth.*, 325 F Supp 2d 15 [D RI 2004], *affd sub nom. Ungar v Palestine Liberation Org.*, 402 F3d 274 [1st Cir 2005], *cert denied* 546 US 1034 [2005]). In April 2005, plaintiffs domesticated their judgment in New York County.

Plaintiffs learned that Swiss American Securities was holding a large portfolio of stocks and bonds in the Pension Fund's name. In February 2006, they simultaneously commenced this action, which seeks a declaration that such securities actually belong to the PA (CPLR 3001), and a turnover proceeding against Swiss American (CPLR 5225 [b]), which was ultimately dismissed by Supreme Court. This appeal is brought by the Pension Fund from the denial of its motion to strike plaintiffs' demand that the remaining declaratory judgment action be tried before a jury.

This action, like other proceedings brought by plaintiffs to collect the judgment, is predicated on the contention that the PA and the particular Palestinian entity on behalf of which funds are held are alter egos (*see e.g. Knox v Orascom Telecom Holding S.A.E.*, 477 F Supp 2d 642, 648 n 5 [SD NY 2007]; *Estate of Ungar v Orascom Telecom Holding S.A.E.*, 578 F Supp 2d 536, 550 [SD NY 2008]; *Palestine Monetary Auth. v Strachman*, 62 AD3d 213, 218 [2009]). Plaintiffs allege that the "Palestinian Pension Fund" designation on the custodial account is "merely a fictitious name invented and used by the [PA] to conceal the true ownership and nature of these funds," that the judgment debtors have expressly refused to pay the judgment, and that plaintiffs have been obliged to seek out the judgment debtors' assets in the United States and abroad. The complaint states that the PA has

"systematically held and managed the PA's and

> PLO's assets under various fictitious names and aliases in order to hide the PA's and PLO's involvement in financial activities from parties who would not otherwise do business with them, and to shield the financial activities and assets of the PA and PLO from law-enforcement and tax authorities and from creditors such as the instant Plaintiffs."

The pleadings do not identify any transfer that was made to Swiss American after plaintiffs obtained their judgment or that would otherwise be rendered fraudulent under Debtor and Creditor Law §§ 278 and 279.

The Pension Fund responds that it is a distinct legal entity responsible for the management of a pension system for some 50,000 civil, administrative and municipal employees in the Gaza Strip. It explains that the pension system, originally founded in 1964, currently makes payments to between 5,000 and 6,000 beneficiaries and that the account name, "The Palestinian Pension Fund of State Administrative Employees" is a name used exclusively by it and not by the PA.

It is well settled that the question of whether one entity is the alter ego of another is a matter consigned to the equitable discretion of the court (*Matter of Morris v New York State Dept. of Taxation & Fin.*, 82 NY2d 135, 141 [1993]). "The party seeking to pierce the corporate veil must establish that the owners, through their domination, abused the privilege of doing business in the corporate form to perpetrate a wrong or injustice against that party such that a court in equity will intervene" (*id.* at 142; *see TNS Holdings v MKI Sec. Corp.*, 92 NY2d 335, 339 [1998] [alter ego analysis "(a)kin to piercing the corporate veil"]). Whether the PA and the Pension Fund are discrete entities is an issue that must be tried to the court and does not implicate the need for a jury, advisory or otherwise.

In aid of their effort to bring this matter before a jury, plaintiffs adopt an anomalous position, portraying the alleged alter egos as discrete entities that have conspired to perpetrate a fraud on their judgment creditors. As plaintiffs summarize their case for this purpose, "this action alleges in essence that the PA and the [Pension Fund] are engaged in a fraudulent plan to prevent the Ungars from executing their judgment against the assets at issue." In support of their demand that the matter be tried before a jury (CPLR 4101), plaintiffs contend that the nature of the claim underlying the declaratory judgment action is legal rather than equitable (*see Murphy v American Home*

*Prods. Corp.*, 136 AD2d 229, 231-232 [1988]), arguing that the complaint states a cause of action akin to the common-law action for unlawful interference with a judgment. They "allege that the [Palestinian Authority] and its co-conspirator the [Pension Fund] conspired to place the assets at [Swiss American Securities] out of the Ungars' reach, by fraudulently asserting that the assets are the property of the [Pension Fund]."

In support of their asserted right to a jury trial, plaintiffs contend that the action they purport to maintain is analogous to an action at law that was cognizable when the right to trial by jury was fixed. Thus, they suggest, it remains an action for which a jury trial is available. The trouble with this reasoning is that the restrictions imposed on the right of a judgment debtor to dispose of assets, in the interest of protecting the right of a judgment creditor to recover against those assets, is a matter of statute and had been controlled by statute for at least the better part of a century before the right to jury trial was fixed in 1894. Consistent with the governing statutes, the analogous action invoked by plaintiffs—unlawful interference with a judgment—required that the judgment creditor have a lien on the property alleged to have been fraudulently transferred. Since plaintiffs have yet to establish their right to a lien on the assets held on behalf of the Pension Fund, they cannot maintain such an action.

It was long ago settled that a debtor is free to dispose of property at will and that any such disposition is not actionable by a creditor until a superior right in the property has been acquired. In *Adler v Fenton* (24 How [65 US] 407, 410 [1860]), the United States Supreme Court stated the general rule that an aggrieved party " 'must not only establish, that the alleged tort or trespass has been committed, but must aver and prove his right or interest in the property or thing affected, before he can be deemed to have sustained damages for which an action will lie' " (quoting *Hutchins v Hutchins*, 7 Hill 104, 109 [1845]). More particularly, the Court observed that "chancery will not interfere to prevent an insolvent debtor from alienating his property to avoid an existing or prospective debt, even when there is a suit pending to establish it" (*id.* at 411). Quoting *Moran v Dawes* (1 Hopk Ch 365, 367 [1825]), the Court continued:

> "Our laws determine with accuracy the time and manner in which the property of a debtor ceases to be subject to his disposition, and becomes subject to the rights of his creditor. A creditor acquires a lien

upon the lands of his debtor by a judgment; and upon the personal goods of the debtor, by the delivery of an execution to the sheriff. It is only by these liens that a creditor has any vested or specific right in the property of his debtor. Before these liens are acquired, the debtor has full dominion over his property; he may convert one species of property into another, and he may alienate to a purchaser. The rights of the debtor, and those of a creditor, are thus defined by positive rules; and the points at which the power of the debtor ceases, and the right of the creditor commences, are clearly established. These regulations cannot be contravened or varied by any interposition of equity" (*Adler*, 24 How [65 US] at 411-412 [internal quotation marks omitted]).

The Court emphasized that while protection ought to be afforded against "acts of an insolvent or dishonest debtor . . . the Legislature must determine upon the remedies appropriate for this end" (*id.* at 412). It concluded,

"In the absence of special legislation, we may safely affirm, that a general creditor cannot bring an action on the case against his debtor, or against those combining and colluding with him to make dispositions of his property, although the object of those dispositions be to hinder, delay, and defraud creditors" (*id.* at 413).

In support of their action for fraudulent conspiracy against the Pension Fund despite their lack of a lien against the Pension Fund's assets, plaintiffs rely on *Quinby v Strauss* (90 NY 664 [1882]). Contrary to the clear pronouncements of New York courts in *Hutchins* and *Moran*, quoted by the Supreme Court in *Adler*, plaintiffs construe *Quinby* as affording an action at law against a judgment debtor and his attorney, who conspired to prevent execution against certain of the debtor's personalty, even in the absence of "the delivery of an execution to the sheriff," as required by *Moran* (1 Hopk Ch at 367). Plaintiffs further contend that this interpretation of *Quinby* was adopted by the Court of Appeals in *Braem v Merchants' Natl. Bank of Syracuse* (127 NY 508 [1891]) and by this Court in *James v Powell* (25 AD2d 1 [1966], *revd* 19 NY2d 249 [1967]). This analysis is flawed.

The report of *Quinby* is unclear both as to the facts and the Court's rationale. In particular, the decision fails to specify

whether the judgment creditors had obtained a lien on the alienated property or not. The case holds only that the trial court properly instructed the jurors that if they were satisfied the defendants had conspired to keep the judgment debtor's property out of the reach of his creditors, the "plaintiffs were entitled to a verdict for the amount of the judgments, and for such amount for the trouble and inconveniences as the jury should consider had been proved to have been sustained by plaintiffs" (*Quinby*, 90 NY at 664-665). A subsequent case indicates that the plaintiff in *Quinby* had already obtained an execution on the judgment prior to the fraudulent transfer complained of (*see Hurwitz v Hurwitz*, 10 Misc 353, 358 [1894]). Thus, *Quinby* is wholly consistent with the reasoning set forth in *Adler*. As to *Braem*, the *Hurwitz* court stated that, rather than follow *Quinby*, "the Court of Appeals in *Braem* v. *Merchants' Bank* expressly repudiated the principle supposed to have been propounded in *Quinby* v. *Strauss*" (*Hurwitz*, 10 Misc at 358-359), applying the traditional rule that the right to recover a debtor's personalty arises when an execution is delivered to the sheriff (*Braem*, 127 NY at 515).

Plaintiffs' reliance upon *James v Powell* (25 AD2d 1 [1966], *supra*) is equally misplaced. *James* adopted the rationale purportedly propounded in *Quinby*, portraying the action not as one on the judgment but for damages resulting from expenses incurred as a result of interference with efforts to collect on the judgment. However, its reasoning was expressly rejected by this Court in *Federal Deposit Ins. Corp. v Porco* (147 AD2d 422, 423 [1989], *affd* 75 NY2d 840 [1990]), a case not cited by either party, which holds that "a creditor must have a lien or other interest in fraudulently transferred property of his debtor in order to maintain an action for damages for conspiracy to defraud him of his claim by such transfer" (*see also James*, 25 AD2d at 5 [Witmer, J., dissenting]). We further pointed out that "[i]n *James v Powell*, moreover, a judgment had already been entered against the debtor at the time of the fraudulent transfer" (*Federal Deposit Ins. Corp.*, 147 AD2d at 423). Finally, it should be noted that in reversing *James*, the Court of Appeals remanded the case to Supreme Court for, inter alia, reconsideration of the sufficiency of the complaint (*James*, 19 NY2d at 259).

*Adler v Fenton* (24 How [65 US] 407, 411 [1860], *supra*) indicates that by 1825, when *Moran v Dawes* (1 Hopk Ch 365, 367 [1825], *supra*) was decided, the respective rights of debtors

and their judgment creditors were governed by statute and could not be varied by a court in the exercise of its equitable powers. While *Quinby* indicates that the common-law action for unlawful interference with a judgment, relied upon by plaintiffs as a predicate for trial by jury, survived the enactment of these statutes, it is clear that in the absence of a lien against assets alleged to have been fraudulently transferred, the action was not available (*see e.g. Yates v Joyce*, 11 Johns 136 [1814]).

Without a lien against the assets held on the Pension Fund's account, plaintiffs may not maintain an action for the alleged fraudulent transfer, whether denominated unlawful interference with a judgment, tortious interference with economic advantage, prima facie tort or fraud, all of which they invoke on appeal. Since the alleged fraudulent transfer does not support the asserted action at law, it does not afford grounds for a jury demand (*see Murphy*, 136 AD2d at 231-232).

Accordingly, the motion should be granted and plaintiffs' jury demand struck.

MAZZARELLI, NARDELLI and MOSKOWITZ, JJ., concur with CATTERSON, J.; TOM, J.P., dissents in a separate opinion.

Order, Supreme Court, New York County, entered May 7, 2008, affirmed, with costs.