OPINION OF THE COURT
Shirley Werner Kornreich, J.
Defendants Steven Abramson and Diane Plateis (collectively, movants) move (motion sequence 001) to disqualify plaintiffs counsel — the Lebowitz Law Office, LLC (LLO), Marc Lebowitz, Esq., who is its sole member, and Keith Getz (collectively, firm). Movants argue that Lebowitz and Getz are necessary witnesses, that their testimony will be prejudicial to their client, and that the firm’s continued representation violates Rules of Professional Conduct (22 NYCRR 1200.0) rule 3.7, the advocate-witness rule (rule).
Plaintiff, Daniel Salomone, opposes. He maintains that the firm is a witness solely on the issue of legal fees, an exception to the rule. Further, he notes that the firm was neither involved in drafting the cross-indemnification agreement (IA), the subject of the action, or the related asset purchase agreement (APA) and, as a result, the firm’s testimony is not necessary testimony on the issues of their meaning and defendants’ rescission counterclaim. In addition, plaintiff contends that the firm’s testimony will not be prejudicial to plaintiff, the motion *320 is premature because discovery is incomplete, and defendants waived their objection by waiting too long to raise it and by failing to oppose a motion for the firm’s retention as special litigation counsel in Salomone’s related bankruptcy proceeding.
In the opposing papers, without a cross motion, plaintiff says that if the firm is disqualified, then the law firm representing movants, Rottenberg Lipman Rich, RC. (Rottenberg firm), also should be disqualified based on the rule and because it has a conflict of interest. Movants oppose.
Background
This action arises out of the 2004 sale, pursuant to the APA, of the assets of a medical education business called Current Medical Directions, Inc. (CMDI). CMDI is a wholly owned subsidiary of CMD Holding Corporation (Holding, with CMDI, sellers). The parties to this action (collectively, stockholders) were all of the stockholders of Holding. Salomone was the CEO, president and the largest stockholder of Holding. The purchaser was CMD Sudler Acquisition Co., LLC, now known as Current Medical Directions, LLC (purchaser), a wholly-owned subsidiary of Sudler & Hennessey LLC, whose ultimate parent was WPP Group PLC (collectively, WPP).
The APA appointed Salomone as “Representative” of the stockholders and empowered him
“in such capacity to act as . . . the agent and true and lawful attorney-in-fact of each Stockholder . . . and with full capacity and authority in his sole discretion, to act in the name of and for and on behalf of each Stockholder in connection with all matters arising out of, resulting from, contemplated by or related or incident to [the APA].”
In article XII of the APA, the stockholders, also defined as “Representors,” agreed to indemnify WPP[1] and assume liability for, inter alia, breach of any representation contained in article III of the APA; breach of the APA or contemporaneous agreements, excluding employment and noncompete agreements; third-party claims relating to any retained liability, a defined term; and any litigation or claim relating to disclosed claims listed on a schedule to the APA. Section 13.15 of the IA allowed the representative, i.e., Salomone, inter alia, to accept service of process for the stockholders; to bring, assert, defend, negoti *321 ate or settle any indemnity claims arising out of the APA; and to retain legal counsel and be reimbursed by the representors for all legal fees, expenses and other charges for such counsel. Contemporaneously, the stockholders entered into the IA, in which they agreed to indemnify Salomone and assume responsibility for liabilities arising pursuant to article XII of the APA in proportion to the percentage of the stock that they owned, as stated in section 2 of the IA. Defendants now dispute those percentages and counterclaim for reformation of the IA.
In the APA, the stockholders agreed to indemnify Salomone for “all liabilities, obligations, losses, damages, penalties, claims, actions, suits, judgments, settlements, out-of-pocket costs, expenses and disbursements that may be imposed on or incurred by the Representative as a consequence, or as a result, of any actions taken by the Representative within the scope of his/her authority.” A Mr. Gersh, who was not, and is not, with the firm, prepared the APA and the IA. The APA closed on January 1, 2005.
Under article II of the APA, a large part of the purchase price of up to $65 million was dependent on contingent payments, which were available based upon formulae involving the calculation of operating profit after taxes (OPAT) of the purchaser in the calendar years ending 2004 through 2008. At the closing, the stockholders received $5,596,072, which they shared. The purchaser has not paid any of the contingent payments.
Contemporaneously with the APA, the stockholders entered into separate employment agreements with the purchaser. In Salomone’s employment agreement, commencing January 1, 2005, he could be terminated only for cause, which included a shortfall in OPAT, as calculated for the calendar year ending December 31, 2005, of less than 75% of the average annual OPAT for 2002 through 2004 (OPAT shortfall). Salomone’s employment agreement also contained a noncompete clause (restrictive covenant).
In March 2006, WPP terminated Salomone’s employment, based upon an OPAT shortfall, and sued him for breach of the APA, fraudulent inducement of the APA, and fraud (WPP action).[2] Salomone retained LLO to represent him. On July 20, 2006, Salomone won a pre-answer motion to dismiss WPP’s *322 fraud claim based on failure to state a claim, and WPP voluntarily withdrew its claim for punitive damages. (WPP action, document No. 17 [order], document No. 6 [notice of motion].) Salomone filed an answer and counterclaims in the WPP action in August 2006. (Document No. 21.) On February 2, 2010, decision was rendered in Mr. Salomone’s favor on a motion for summary judgment on liability for his termination claim based upon WPP’s breach of his employment agreement, i.e., failure to calculate OPAT. (Document No. 22.)
There was significant overlap between Salomone’s personal counterclaims in the WPP action and the counterclaims he made on behalf of the stockholders/sellers. There were seven counterclaims in all. The first counterclaim was Salomone’s claim for wrongful termination of his employment (termination claim). Part of the termination claim was based upon incorrect calculation of the OPAT shortfall. Movants contend that, over the objections of the other stockholders, Salomone chose to litigate a second lawsuit by the purchaser for a “Working Capital Shortfall,” under article II of the APA, which required the seller to pay the purchaser if working capital was less than $1,250,000. Movants say that Salomone employed this strategy because the working capital shortfall was based on the same accounting as the OPAT shortfall and would have resulted in dismissal of the termination claim. Six of the seven counterclaims involved the same allegations as the termination claim, i.e., miscalculation of OPAT, interfering with Salomone’s management of the business and not permitting Salomone to report to the CEO.[3]
More than seven years before this disqualification motion was filed, movants noted their concern with Lebowitz’s strategy in *323 the WPP action. On January 18, 2007, movant Abramson’s counsel, on behalf of movants, wrote a letter (Jan. 2007 letter) stating that a substantial portion of WPP’s main claims and Salomone’s counterclaims were not covered by the IA and questioning his legal strategy. (Document No. 33.) Abramson’s counsel wrote:
“I express the views of [Abramson, Dennis and Plateis] when I observe that a substantial portion of the [WPP] complaint’s — allegations concerning CEO succession at the company — are not covered by the [IA]; that the counterclaims are not covered by the [IA]; that the failure to serve notice of appeal concerning the lower court’s decision declining to dismiss the fraud counts may have unnecessarily prolonged and complicated the litigation; and that each of the partners has reservations about the validity of the cross-indemnification. . . .
“It is in all the partners’ best interests to devise a strategy that resolves this case [the WPP Action] as quickly as possible, and our preference is that issues regarding contribution be resolved at the conclusion of the case.” (Id.)
The “CEO succession” action underlay WPP’s fraud and fraudulent inducement claims.
In May 2011, WPP brought a second lawsuit against Salomone seeking the working capital shortfall adjustment under the APA (working capital action,[4] collectively with the WPP action, the WPP cases). Prior to its commencement, on October 5, 2010, movant Abramson’s counsel, on behalf of all of the defendants here except Armor, wrote a letter to Lebowitz complaining that Salomone had rejected a global settlement of the WPP cases, objecting to Salomone’s insistence on proceeding with the termination claim, and putting him on notice that the expense going forward was on his shoulders (Oct. 2010 letter). (Document No. 26.)
According to Mr. Lebowitz’s affirmation filed in opposition to the motion, Salomone was forced, due to the expense of litigation, to stipulate to the entry of a judgment against him in the working capital action. “The only way to dispute WPP’s assertion that $851,455.00 was due from the selling stockholders was to institute a complex and expensive expert accounting *324 procedure, set forth in the APA.” Thus, in July 2011, Salomone agreed to the entry of judgment against him for the amount sought in the working capital action, approximately $8.5 million (judgment). WPP agreed to delay collection of the judgment until after the WPP action trial, but refused to continue its forbearance when the trial was delayed. WPP went after Salomone’s bank accounts, his wife and his home. WPP’s collection efforts forced Salomone into bankruptcy.
Salomone filed a chapter 11 petition in March 2012.[5] On March 29, 2012, Salomone filed a notice of bankruptcy in the WPP action, noting the automatic stay of actions against him, pursuant to 11 USC § 362. (WPP action, document No. 218.) Movants admit that Salomone commenced adversary proceedings in the Bankruptcy Court against them and movant Jodi Dennis, which sought the same relief as in this case, i.e., recovery under the LA (bankruptcy adverse proceedings). (Movants’ mem of law, document No. 14 at 9.) In August 2012, the Bankruptcy Court found that it had jurisdiction over the defendants in this action and referred the issues involved to mediation. (Document No. 30.) Current counsel for the movants, as well as separate counsel for movant Abramson was on the list for service of the order. (Id.)
Movants do not dispute that the Bankruptcy Court granted a motion, on notice to defendants, permitting Salomone to retain LLO as special counsel to assist in the bankruptcy and bankruptcy adverse proceedings. (Document No. 44, Lebowitz affirmation, Dec. 9, 2014, ¶ 30 [Lebowitz affirmation]; document No. 57, Lebowitz affirmation, exhibit M; Salomone aff, Dec. 31, 2013, ¶ 12.) Salomone’s affidavit in support of the application stated that: (1) LLO was “intimately familiar with the facts underlying” the WPP action, the judgment and two indemnification actions between Salomone and defendants (collectively, state court litigation) that arose out of defendants’ “continued refusal to honor their indemnification obligations”; (2) LLO had been defending the WPP action and prosecuting Salomone’s counterclaim for wrongful termination; and (3) since 2006, LLO had engaged in extensive discussions, strategy sessions and negotiations in connection with the state court litigation. (Id. ) In footnote 4 of Salomone’s affidavit, this action’s index number was listed as one of the indemnification actions. (Id.) Movants’ reply memorandum of law says that they did not oppose the *325 Bankruptcy Court motion because this action was stayed pending resolution of the WPP action. Lebowitz avers that Salomone agreed to the stay because he could not afford to fight on two fronts at once and infighting would have harmed his defense.
Salomone then settled the WPP case. Salomone gave up the damages for his termination claim. WPP reduced the judgment by almost 50%. Defendants entered into a settlement of the judgment, agreeing to pay $139,000. (Document No. 31.) Salomone, by separate settlement, agreed to pay $250,000 to settle the judgment. (Id. ) Salomone paid WPP nothing for its breach of contract and fraudulent inducement claims. The court’s records reflect that a stipulation of discontinuance was filed in the WPP action on July 19, 2013 (discontinuance). (WPP action, document No. 230.) Consequently, the stay of this action ended on July 19, 2013.
This action seeks to recover, pursuant to the IA, legal fees and costs Salomone incurred in the WPP action. The gist of the dispute is defendants’ assertion that Salomone interposed personal counterclaims in the WPP action that are not covered by the IA and that he interposed frivolous motions and defenses, which delayed the WPP action, made it impossible to settle, and drove up the legal fees of the firm. In addition, movants state that the WPP action contained bona fide claims against Salomone for fraud and fraudulent inducement. However, as the fraud claim was dismissed for failure to state a claim on a pre-answer motion, it has been judicially determined that the WPP fraud claim was not bona fide. Defendants have not indemnified Salomone for any of the expenses he incurred.
After the WPP action was settled, movants’ answered the complaint here on July 24, 2013. (Document No. 2.) They raised affirmative defenses and asserted counterclaims, including that Salomone “and/or his counsel in the WPP Lawsuit failed to mitigate Plaintiffs alleged damages” (second affirmative defense); Salomone’s culpable conduct caused the damages and any judgment should be apportioned to reflect his culpability (fourth affirmative defense); a declaratory judgment should be issued correcting the stockholders’ percentages in the IA; and the IA should be rescinded based upon fraudulent inducement (third affirmative defense and first counterclaim). (Document No. 2.)
On December 5, 2013, a preliminary conference was held in this case, and the court referred the parties to mediation. *326 (Document Nos. 7, 8.) On July 10, 2014, movants asked for an order requiring the firm to turn over its invoices and raised the disqualification motion. (Document No. 11.) The court ordered that September 2, 2014 was the deadline for the disqualification motion. (Id.) The deadline was extended to October 2, 2014, because movants said that they needed the firm’s invoices to make the motion. (Document No. 12.) This motion was filed on November 7, 2014. (Document No. 13.)
Salomone’s request to disqualify the Rottenberg firm rests on the following: (1) Abramson and Dennis made agreements with WPP, in which WPP agreed to indemnify them for any judgment against, or settlement with, Salomone on the breach of contract claim in the WPP action, or any settlement which did not indicate whether it was for that claim (Lebowitz affirmation, exhibits H, I, document Nos. 52, 53 [side agreements]); (2) counterclaims and cross claims in this action put the interests of the movants in conflict; and (3) the Rottenberg firm engaged in strategy discussions and negotiations with Lebowitz concerning the WPP action, which may require them to testify.
The side agreements are referred to in the complaint in paragraphs 30-31. (Document No. 1.) In the side agreements, Abramson and Dennis agreed to cooperate with WPP hy not raising any claim against, and assisting, WPP. (Id.) Salomone alleges that the side agreements put Abramson and Dennis in conflict with the other defendants, one of whom is Plateis, who, along with Abramson, is represented by the Rottenberg firm. (Lebowitz affirmation ¶¶ 33-34.) The Rottenberg firm filed a notice of appearance for Abramson on September 11, 2013. (Document No. 5.) Lebowitz avers that defendant Rios has filed a cross claim against movants, but the pleading is not part of the record and is not e-filed. As a result, it is not clear that Rios’ cross claim is based on the side agreements. The specific nature of the Rottenberg firm’s allegedly necessary testimony is not described.
Discussion
A, Motion to Disqualify the Firm
Rule 3.7 reads as follows:
“Lawyer as witness.
“(a) A lawyer shall not act as advocate before a tribunal in a matter in which the lawyer is likely to be a witness on a significant issue of fact unless:
“(1) the testimony relates solely to an uncontested *327 issue;
“(2) the testimony relates solely to the nature and value of legal services rendered in the matter;
“(3) disqualification of the lawyer would work substantial hardship on the client;
“(4) the testimony will relate solely to a matter of formality, and there is no reason to believe that substantial evidence will be offered in opposition to the testimony; or
“(5) the testimony is authorized by the tribunal.
“(b) A lawyer may not act as advocate before a tribunal in a matter if:
“(1) another lawyer in the lawyer’s firm is likely to be called as a witness on a significant issue other than on behalf of the client, and it is apparent that the testimony may be prejudicial to the client; or
“(2) the lawyer is precluded from doing so by Rule 1.7 or Rule 1.9[6]” (22 NYCRR 1200.0, rule 3.7.)
The legal services exception does not apply here because Lebowitz’s testimony would relate to services rendered in the WPP action. The New York State Bar Association Comment to the rule interprets the “legal services” exception as limited to testimony concerning the extent and value of legal services “rendered in the action in which the testimony is offered.” (Rules of Professional Conduct [22 NYCRR] rule 3.7 Comment [3], available at www.nysba.org/professionalstandards.) Hence, Lebowitz’s testimony about legal services in the WPP action does not fall within the exception.
Disqualification on the ground that an attorney is likely to be a witness is not mandatory: “In determining whether to disqualify an attorney on the ground that he or she will likely be a witness, the court is guided, but not bound by, the standards set forth in rule 3.7 . . . , and whether to disqualify an attorney rests in the sound discretion of the court.” (Harris v Sculco, 86 AD3d 481, 481 [1st Dept 2011], citing S & S Hotel Ventures Ltd. Partnership v 777 S. H. Corp., 69 NY2d 437 [1987] [advocate-witness rule provides guidance, not binding authority].) The policy behind the rule is that the roles of advocate and witness are inconsistent, and it is unseemly for a lawyer to argue his own credibility as a witness during a trial. (S & S Hotel Ventures Ltd. Partnership at 444.)
*328 In applying the rule, a court must consider a litigant’s valued right to select its own counsel and the fairness and effect of disqualification in the particular factual setting. (S & S Hotel Ventures Ltd. Partnership at 440; Homar v American Home Mtge. Acceptance, Inc., 119 AD3d 901 [2d Dept 2014].) Restrictions on a party’s right to select representation by a particular attorney should be carefully scrutinized because disqualification can be used as a tactic to “stall and derail the proceedings, redounding to the strategic advantage of one party over another.” (S & S Hotel Ventures Ltd. Partnership at 443.) The rule is subject to an exception “where withdrawal ‘would work a substantial hardship on the client because of the distinctive value of the lawyer as counsel in the particular case’ ” (People v Townsley, 20 NY3d 294, 299 [2012]).
The necessity of the attorney’s testimony takes into account such factors as the significance of the matters, the weight of the testimony and the availability of other evidence. (S & S Hotel Ventures Ltd. Partnership at 446.) Disqualification should be granted where no other witness can provide crucial testimony. (Sokolow, Dunaud, Mercadier & Carreras v Lacher, 299 AD2d 64, 75 [1st Dept 2002].) A party seeking disqualification must make a showing that the testimony of plaintiff’s attorney will be necessary to establish the claim or be prejudicial to the plaintiff in the event the attorney is called by the other side. (East Forty-Fourth St. LLC v Bildirici, 58 AD3d 542 [1st Dept 2009]; see Magnus v Sklover, 95 AD3d 837 [2d Dept 2012] [to disqualify, movant must show testimony of opposing counsel necessary to his case and would be prejudicial to opposing party].) However, where the attorney’s testimony is necessary to support his client’s claim, it is not essential to show that the attorney’s testimony will have a potentially prejudicial impact on his or her client. (Lauder v Goldhamer, 122 AD3d 908, 911 [2d Dept 2014] [decided under rule 3.7]; Sokolow, Dunaud, Mercadier & Carreras v Lacher at 76 [showing that attorney’s testimony will be prejudicial to his client required only when attorney will be called as witness by adverse party]; Skiff-Murray v Murray, 3 AD3d 610, 611-612 [3d Dept 2004]; see Fuller v Collins, 114 AD3d 827 [2d Dept 2014] [under rule 3.7 of Rules of Professional Conduct where attorney only person, other than defendant, with knowledge of issue and is “likely” to be witness on significant issue, attorney disqualified].)
A disqualification motion can be granted before discovery is complete in certain circumstances. Where the “substance and *329 necessity” of the attorney’s testimony is unknown, a decision on disqualification should await discovery. (Harris v Sculco, 86 AD3d 481, 481 [1st Dept 2011].) On the other hand, where there is little doubt as to the substance of the lawyer’s testimony or whether it is necessary to prove a party’s claim, then disqualification need not await completion of discovery. (Sokolow, Dunaud, Mercadier & Carreras v Lacher [arguments raised in underlying litigation between parties provided sufficient basis to conclude without discovery that attorney’s testimony would be necessary]; Skiff-Murray v Murray, 3 AD3d 610, 611-612 [3d Dept 2004].)
Applying these principles to the case at bar, it is clear, without the need for further discovery, that Lebowitz will be a necessary witness on the crucial issues, such as why he chose the legal strategy of combining Salomone’s personal counterclaims with other claims and the alleged refusal to compromise the working capital action due to its impact on the termination claim involving the OPAT shortfall. The court notes that Lebowitz submitted a lengthy affirmation that did not contest movant’s assertion that he would testify as to these issues. Nor did he state that any other witness was available to testify on those subjects. These subjects are not limited to the amount of legal fees incurred in this action. Lebowitz will need to testify as to more than their amount. He was the lead legal strategist for Salomone. Moreover, no hardship exception is demonstrated beyond a conclusory statement. There is nothing in the record concerning Salomone’s current finances. Therefore, Lebowitz should be disqualified, unless movants waived their right to that relief or delayed too long in making the motion.
Waiver is defined as the voluntary and intentional relinquishment of a known right. (Werking v Amity Estates, 2 NY2d 43, 52 [1956].) “This intent must be clearly established and cannot be inferred from doubtful or equivocal acts or language.” (Matter of East 56th Plaza v Abrams, 91 AD2d 1129, 1130 [3d Dept 1983].) The party raising the defense of waiver has the burden of proving it. (City of New York v State of New York, 40 NY2d 659, 669 [1976].)
A motion to disqualify should be denied where a delay in making the motion is “inordinate and inadequately explained.” (Lewis v Unigard Mut. Ins. Co., 83 AD2d 919, 920 [1st Dept 1981].) The First Department has held that the moving party’s laches in making a disqualification motion is a “relevant consideration” and that an “inordinate delay in moving for *330 such relief is an indication that the motion has been made to gain a tactical advantage in the litigation.” (St. Barnabas Hosp. v New York City Health & Hosps. Corp., 7 AD3d 83, 95 [1st Dept 2004] [delay of more than a year]; H.H.B.K. 45th St. Corp. v Stern, 158 AD2d 395, 396 [1st Dept 1990] [advocate-witness disqualification denied where made six months after action commenced and subject of attorney’s testimony was known since inception]; Matter of Peters, 124 AD3d 1266, 1270 [4th Dept 2015] [one-year delay in bringing disqualification motion based on conflict].)
In St. Barnabas, the plaintiff, St. Barnabas Hospital, sought to disqualify the law firm representing the defendant hospital, New York City Health and Hospitals Corporation (HHC), in an action filed in 2001. St. Barnabas sought payment for services rendered by doctors and professionals it employed. St. Barnabas moved to disqualify on the ground that the firm representing HHC had previously represented St. Barnabas in: (1) employment harassment/discrimination cases from 1998 through 2002; and (2) negotiations with a medical biller, that involved similar issues as the litigation against HHC, but from which HHC’s firm withdrew when the case reached litigation in 2000. The First Department denied St. Barnabas’ motion to disqualify the firm representing HHC, holding that St. Barnabas had waived its right to object by waiting for almost a year, while the firm served an answer for HHC, engaged in settlement negotiations, served discovery demands, and prepared to produce documents. However, St. Barnabas is factually distinguishable from this case, in that St. Barnabas had signed an express waiver of the conflict when it retained the firm in 1998 in the employment cases. Also, it did not involve the advocate-witness rule.
This action was filed in 2008. In the January 2007 letter, movants were aware of the IA coverage issues with respect to the termination claim and the WPP action fraud claims, and expressed concerns about prompt resolution. In the October 2010 letter, movants complained to Lebowitz of Salomone’s failure to settle the WPP cases due to his pursuit of the termination claim. It is undisputed that in January 2013 movants did not oppose the retention of LLO as special counsel to Salomone in the bankruptcy, where Salomone sought leave for LLO to help with the adverse proceedings, which included the same claims made in this action. Lebowitz would have had to testify as to the same matters in the bankruptcy, had it not been resolved by settlement.
*331 From these facts, it is clear there was a waiver. Movants intentionally and voluntarily consented to LLO’s representation in the bankruptcy, where Lebowitz would have been a witness on the same issues presented here. Just as in St. Barnabas, the waiver took place in the context of a different lawsuit: in St. Barnabas, it was the employment cases; here it was the bankruptcy. While there was no express written waiver here, as in St. Barnabas, the situation is analogous. Movants consented to Lebowitz’s representation in the bankruptcy by not opposing the motion, although it was likely that he would have been a witness on the same issues presented in this case. After the WPP action was settled in July 2013, this action was no longer stayed. In December 2013, the parties had a preliminary conference, began discovery and went to mediation. (Document Nos. 7, 8.) In St. Barnabas, the Court counted settlement negotiations and litigation in determining that the delay was inordinate, noting that all the while the movant was aware of the grounds for the disqualification motion. (St. Barnabas Hosp. v New York City Health & Hosps. Corp. at 93.) A year after the stay of this action ended, in July 2014, movants told this court that they planned to make this motion. (Document No. 11.) Movants then waited until November 2014 to file it, allegedly because they needed LLO’s invoices. Thus, six years after the case was filed, movants ask for disqualification.
Movants’ explanation for their delay in seeking disqualification rings hollow. Their motion is denied. As movants point out in their motion papers, Lebowitz will have to testify as to why Salomone pursued certain litigation tactics in the WPP action and the allocation of the firm’s time between matters covered by the IA and matters that are not, such as the termination claim and WPP’s fraud claims. There is absolutely no doubt that the tension between claims that fall under the IA and those that do not has been known to movants since 2007, when they sent the January 2007 letter. The complaint was filed by LLO. Movants sent the October 2010 letter registering their unhappiness with Salomone’s dogged pursuit of his termination claim. The adverse proceedings by Salomone against movants in the bankruptcy were in 2011. Movants did not oppose LLO’s representation. When movants filed their answer here, in July 2013, they were aware of the facts involving Lebowitz’s potential testimony; they raised as an affirmative defense Salomone’s failure to mitigate damages in the WPP action. The invoices were not necessary to establish that Salomone’s *332 personal counterclaims were not covered by the IA, were intertwined with those that are, that the firm and Salomone delayed the WPP litigation by asserting counterclaims, or that the firm’s litigation strategy prolonged the WPP action, frustrated its settlement and inflated the bills. This motion appears to be little more than a tactic to require Salomone to incur the expense of new counsel.
Nevertheless, the court’s research and the parties submission have uncovered only one case in which the attorney’s testimony was found necessary and the disqualification motion was denied for delay. (H.H.B.K. 45th St. Corp. v Stern, 158 AD2d 395, 397 [1st Dept 1990] [denying disqualification after six-month delay where attorney might be witness at bench trial due to ability of court to weigh testimony of attorney/ advocate].) The policy underlying the advocate-witness rule— that it is unseemly for an attorney to advocate his own credibility before a jury, would be undermined by Lebowitz’s appearance as a witness at a jury trial. Not so with a bench trial.
Defendants say that they will demand a jury on the issue of damages. A party’s assertion of an equitable counterclaim related to a cause of action asserted in the complaint, waives a jury on all causes of action. (Herbil Holding Co. v Mitrany, 11 AD3d 430, 432 [2d Dept 2004]; David D. Siegel, Practice Commentaries, McKinney’s Cons Laws of NY, Book 7B, CPLR 4101 at 265 [jury on counterclaim waived where plaintiff sues for money damages for breach of contract and defendant counterclaims for reformation of same contract].) Movants’ claim for a declaratory judgment is an equitable claim, as it is similar to a common-law reformation claim. The determination of whether a declaratory judgment is a legal or equitable claim depends on the traditional tort it most closely resembles. (Strachman v Palestinian Auth., 73 AD3d 124, 127 [1st Dept 2010].) Reformation of a contract is an equitable claim. (Roslyn Union Free School Dist. v Barkan, 16 NY3d 643, 650 [2011].)
Here, movants waived a jury. The complaint seeks damages for breach of the IA and defendants counterclaimed for a declaratory judgment to reform the percentage allocation of their indemnification obligations under the IA. The declaratory judgment counterclaim is related to enforcement of the IA because it seeks to change the percentage of indemnification *333 that Salomone requests in the complaint.[7] Lebowitz’s affirmation waffles on whether Salomone will demand a jury: “Mr. Lebowitz testimony . . . will likely be offered before a referee or Judge at a hearing on damages.” (Lebowitz affirmation at 18.)
In the exercise of discretion, the court will balance these competing interests by denying the motion to disqualify Lebowitz with leave to renew at the time of trial if Salomone demands a jury. Federal courts have permitted attorneys who were potential witnesses at trial to continue to represent their clients during pretrial proceedings. (A.V. By Versace, Inc. v Gianni Versace, S.p.A., 160 F Supp 2d 657, 665 [SD NY 2001] [collecting cases].) Waiting until trial will preserve Salomone’s choice of experienced counsel, who is intimately familiar with the issues, for purposes of disclosure and summary judgment motions, eliminating extra expense until absolutely necessary.[8] Moreover, Salomone may not demand a jury trial. If there is a bench trial, the court will be able to accord proper weight to his testimony. {H.H.B.K. 45th St. Corp. v Stern.)
With respect to LLO and Lebowitz’s associate, Keith Getz, the motion is denied. A law firm may continue representing a client, even if one of its attorneys is disqualified as a necessary witness. Here, movants have not made a showing that Getz will be a necessary witness. (Sokolow, Dunaud, Mercadier & Carreras v Lacher, 299 AD2d 64 [1st Dept 2002].) With respect to LLO, as previously noted, movants consented to its representation of Salomone in the bankruptcy.
B. Motion to Disqualify Rottenberg Firm
The record is insufficient to disqualify the Rottenberg firm on the ground that its representation of movants presents a conflict of interest. The disciplinary rule regarding conflicts of interest provides as follows:
“Rule 1.7: Conflict of interest: current clients.
“(a) Except as provided in paragraph (b), a lawyer shall not represent a client if a reasonable lawyer *334 would conclude that either:
“(1) the representation will involve the lawyer in representing differing interests; . . .
“(b) Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if:
“(1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client; . . .
“(3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and
“(4) each affected client gives informed consent, confirmed in writing.” (22 NYCRR 1200.0.)
Disqualification on the ground of a conflict should not be granted where it is speculative. (Twin Sec., Inc. v Advocate & Lichtenstein, LLP, 97 AD3d 500, 501 [1st Dept 2012].)
On the record before the court, the conflict is speculative. The joint counterclaims against Salomone are an expression that defendants’ interests are united, not conflicted. Rios’ cross claims are not in the record. Hence, it is speculative whether the cross claims involve the Rottenberg firm’s representation of conflicting interests. Nonetheless, the court will revisit this issue at the upcoming conference, currently scheduled for April 21, 2015. The parties shall come prepared, with appropriate documentation such as the Armor cross claims, to discuss the alleged conflict.
Disqualification of the Rottenberg firm due to the advocate-witness rule also is not supported by the record. Although Lebowitz states that the Rottenberg firm was involved in the WPP cases, he does not identify necessary testimony that only the Rottenberg firm could supply. (Sokolow, Dunaud, Mercadier & Carreras v Lacher at 75; East Forty-Fourth St. LLC v Bildirici.) The request to disqualify the Rottenberg firm is denied without prejudice. Should it become apparent that it is representing conflicting interests, that the firm’s testimony is necessary on a significant issue for which there is no other available evidence, or that Salomone will call the firm to give testimony prejudicial to its clients, the issue will be revisited. Accordingly, it is ordered, that the motion by defendants Steven Abramson and Diane Plateis to disqualify Marc Lebowitz, the Lebowitz Law Office, LLC, and Keith Getz, as attorneys for plaintiff, is *335 granted solely to the extent of disqualifying Marc Lebowitz if plaintiff demands a jury trial, and in all other respects the motion is denied; and it is further ordered that the request by plaintiff to disqualify Rottenberg Lipman Rich, P.C., from representing Abramson and Plateis is denied without prejudice, with leave to renew as set forth above.

. Section 13.5 of the APA defined “Affiliates” and affiliates of the purchaser are included in the definition of indemnified parties in section 12.2, bringing WPP within the ambit of the indemnification.

. Current Medical Directions v Salomone, Sup Ct, NY County, index No. 600941/2006.

. The second counterclaim for breach of the APA alleged that Salomone was prevented from managing the business, in breach of section 11.5 of the APA, because he was not permitted to report directly to the CEO, as promised in his employment contract, and that OPAT calculations were not provided by the purchaser; the third counterclaim was for breach of the covenant of good faith and fair dealing in Salomone’s employment agreement and the APA, based partially upon the allegedly erroneous OPAT calculation; the fourth counterclaim for unfair competition mingled a claim that WPP tried to avoid paying the contingent payments due under the APA by, inter alia, interfering with Salomone’s management, not permitting him to report to the CEO, and using a pretext to terminate him; the fifth counterclaim combining fraudulent inducement of his employment contract and the APA, based upon the same alleged misrepresentations; and the seventh counterclaim alleged that the restrictive covenant in his employment contract was unenforceable because the purchaser wrongfully terminated him.

. Current Medical Directions v Salomone, Sup Ct, NY County, index No. 651464/2011.

. In re Daniel Salomone, US Dist Ct, ED NY, Case No. 12-71740 (AST) (Bankruptcy).

6. Rules 1.7 and 1.9 are rules regarding representation that conflicts with the interests of present and former clients, respectively.

. On the other hand, Salomone’s declaratory judgment claim most similarly resembles a cause of action for breach of contract, a legal claim. It seeks a declaration that the IA is applicable to any loss or damage that Salomone sustained as a result of the WPP action and that defendants must pay their pro rata share.

. The parties have not yet taken any depositions, the court has bifurcated the liability phases of trial and discovery, and motions for summary judgment on liability are to be submitted by June 2015. (Document No. 75.)