# State of New York
# Court of Appeals

OPINION

This opinion is uncorrected and subject to revision before publication in the New York Reports.

No. 13
The People &c.,
  Respondent,
    v.
Omar Alvarez,
  Appellant.

Richard M. Greenberg, for appellant.
Yan Slavinskiy, for respondent.

STEIN, J.:

On this appeal, we are asked to determine whether the Appellate Division properly

denied defendant's petition for a writ of error coram nobis based upon his claim that he

was deprived of the effective assistance of appellate counsel due to counsel's failure to

- 1 -

challenge defendant's sentences as unduly harsh and severe, and claimed deficiencies in the quality of both the appellate brief and appellate counsel's communication with defendant. Because defendant was provided with meaningful representation under this State's well-settled ineffective assistance of counsel standard, we conclude that the Appellate Division correctly denied his application. We, therefore, affirm.

In 1996, defendant was convicted, upon a jury verdict, of conspiracy in the first degree, murder in the second degree, two counts of attempted murder in the second degree, assault in the first and second degrees, criminal possession of a weapon in the second and third degrees, and criminal sale of a controlled substance in the second and third degrees. These convictions arose from defendant's membership in a narcotics trafficking organization, which enforced its control over its drug territory with extreme acts of violence. Defendant, who sold large quantities of crack cocaine to undercover police officers on multiple occasions, fulfilled the role of a "manager," whose duties included enforcing discipline among the organization's workers, using physical force to protect the organization and its assets, and supervising street dealers for that organization. In one instance, defendant, together with his codefendants, fired approximately thirty bullets in a drive-by shooting, hitting three teenagers—a 14-year-old and two 15-year-olds. The shooting killed the 14-year-old and caused one of the surviving victims to suffer permanent disabilities.

At sentencing, defendant denied responsibility for the shooting, expressly refused to apologize to the deceased victim's family, and laughed while the Court explained its

sentencing determination. The court ultimately imposed consecutive sentences, whereby defendant received an aggregate term of 66 ⅔ years to life in prison.[1]

On his direct appeal to the Appellate Division, defendant was represented by assigned counsel, who raised four reviewable issues in a brief submitted on defendant's behalf. Specifically, appellate counsel argued that: at the time of defendant's arrest, the police conducted an illegal search, resulting in recovery of a loaded weapon and drugs that should have been suppressed; the trial court erroneously denied defendant's request for an adjournment to review certain evidence with his counsel before trial; the court illegally sealed the witness list, interfering with his ability to prepare for cross-examination of the People's witnesses; and the verdict on the conspiracy count was against the weight of the evidence. The Appellate Division affirmed the judgment of conviction, after considering and rejecting each of appellate counsel's arguments on the merits (275 AD2d 679, 680 [1st Dept 2000]).

Nearly two decades later, in 2017, defendant commenced this proceeding seeking a writ of error coram nobis and vacatur of the Appellate Division order affirming his conviction, based on his claim that appellate counsel's performance was constitutionally defective. The Appellate Division denied defendant's application, and a Judge of this Court granted defendant leave to appeal (30 NY3d 1113 [2018]).

It is well-settled that, to prevail on a claim of ineffective assistance of appellate counsel under the New York Constitution, a defendant must demonstrate that counsel failed

---

[1] The maximum life sentence was mandatory and defendant has never claimed that the minimum sentence was illegal.

to provide meaningful representation (see People v Stultz, 2 NY3d 277, 284 [2004]; People v Baldi, 54 NY2d 137, 147 [1981]).  Unlike the Federal Constitution, which requires a defendant to show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different" (Strickland v Washington, 466 US 668, 694 [1984]), our state standard considers prejudice to be "'a significant, but not indispensable element in assessing meaningful representation'" (People v Caban, 5 NY3d 143, 155-156 [2005], quoting Stultz, 2 NY3d at 284).  Thus, "'[o]ur state standard . . . offers greater protection than the federal test' because, 'under our State Constitution, even in the absence of a reasonable probability of a different outcome, inadequacy of counsel will still warrant reversal whenever a defendant is deprived of [fair process]" (People v Honghirun, 29 NY3d 284, 289 [2017], quoting Caban, 5 NY3d at 155-156).  Nevertheless, we remain "skeptical" of ineffective assistance of counsel claims where the defendant is unable to demonstrate any prejudice at all (Stultz, 2 NY3d at 283-284; see People v Ennis, 11 NY3d 403, 412 [2008], cert denied 556 US 1240 [2009]).

Regarding coram nobis applications in particular, we have held that "[a]ppellate advocacy is meaningful if it reflects a competent grasp of the facts, the law and appellate procedure, supported by appropriate authority and argument" (Stultz, 2 NY3d at 285; see People v Feliciano, 17 NY3d 14, 21 [2011]).  However, "[e]ffective appellate representation by no means requires counsel to brief or argue every issue that may have merit"; rather, appellate attorneys are afforded wide "latitude in deciding which points to advance and how to order them" (Stultz, 2 NY3d at 285; see People v Ramchair, 8 NY3d 313, 316 [2007]).  We again emphasize "that 'counsel's efforts should not be second-

guessed with the clarity of hindsight' and that our Constitution 'guarantees the accused a fair [proceeding], not necessarily a perfect one'" (People v Turner, 5 NY3d 476, 480 [2005], quoting People v Benevento, 91 NY2d 708, 712 [1998]).  A defendant seeking a writ of error coram nobis bears the burden of demonstrating that counsel was ineffective (see People v Session, 34 NY2d 254, 255-256 [1974]; see also People v Arjune, 30 NY3d 347, 357 n 8 [2017], cert denied ___ US ___, 139 S Ct 67 [2018]).

Defendant argues that appellate counsel was ineffective here because he allegedly failed to communicate with defendant during the pendency of his direct appeal, submitted an appellate brief that was poorly structured and that did not challenge the length of the minimum portion of the indeterminate sentence imposed as unduly harsh and severe in the interest of justice, and neglected to file a criminal leave application seeking leave to appeal to this Court.  We conclude that the fairness of defendant's direct appeal was not compromised by appellate counsel's performance and, therefore, defendant was not deprived of meaningful representation.[2]

In support of his application, defendant proffered the brief filed on his behalf in the Appellate Division and a letter sent to him by appellate counsel after the Appellate Division had notified defendant that his case was placed on the dismissal calendar, stating that counsel was working on defendant's appeal.  Defendant also submitted his own affidavit, wherein he averred that he received only one letter from appellate counsel, and maintained that appellate counsel failed to provide him with the appellate briefs or notify him of the

---

[2] We reject the People's alternative contention that defendant's coram nobis application should be denied on the grounds of laches or failure to exercise due diligence.

Appellate Division's decision after his appeal was heard.  Defendant also submitted an affidavit from his wife, who had no relationship with defendant during the pendency of his direct appeal and lacked any personal knowledge regarding counsel's communications with defendant during that time period.  In short, apart from his own otherwise unsupported allegation (see People v Andrews, 23 NY3d 605, 615 [2014]; People v Rosario, 26 NY3d at 603; Arjune, 30 NY3d at 357), defendant provides no proof that his appellate counsel failed to adequately communicate with him.  Thus, on this record, we cannot conclude that defendant satisfied his burden of demonstrating ineffective assistance of counsel on this ground.[3]

Regarding defendant's primary argument—namely, that the quality of the appellate brief and counsel's failure to argue that defendant's sentence was unduly harsh and severe deprived him of meaningful representation—this Court has recognized ineffective assistance of counsel based upon the content of an appellate brief only in very limited circumstances.  In People v Turner, we determined that, in rare instances, the failure to raise a single argument on appeal may constitute a "clear-cut and completely dispositive" error that is "so egregious and prejudicial as to deprive a defendant of [the] constitutional right" to effective representation (5 NY3d at 480 [internal quotation marks and citations omitted]; see People v Ambers, 26 NY3d 313, 317 [2015]).  In People v Gonzalez, the

---

[3] Our dissenting colleagues entreat us to infer from appellate counsel's two-sentence letter that he "waited over three years to take any action on defendant's appeal" (J. Rivera, dissenting op at 9) and had no other communication with defendant while his direct appeal was pending. That the dissenters must resort to such unsupported speculation demonstrates that defendant failed to satisfy his burden of proof.

principal case relied upon by defendant, we determined that a brief setting forth the attorney's position that "there were no points to be raised on appeal," and proceeding to list four point headings requested by the defendant without additional argument—together with other deficiencies—constituted ineffective assistance of appellate counsel due to counsel's complete failure to raise any argument at all (47 NY2d 606, 611-612 [1979]). Likewise, in People v Vasquez, we made clear that appellate counsel's submission of a brief affirmatively disparaging arguments the defendant requested be raised on appeal constitutes ineffective assistance of counsel because, "for all practical purposes," such conduct precluded the client from presenting those arguments in a pro se brief (70 NY2d 1, 4 [1987]).

In the instant matter, there is no question that the brief filed by appellate counsel was somewhat terse, could have been better drafted, and is not a model to be emulated. Nevertheless, the brief demonstrated appellate counsel's grasp of the relevant facts and law. Indeed, appellate counsel raised four reviewable issues that triggered plenary review by the Appellate Division, which ultimately addressed each issue on the merits. Brevity—which, indeed, can be a virtue in an appellate brief—a small number of citations to case law, or even the poor style of a brief that otherwise permits meaningful appellate review does not render appellate representation ineffective under our "undemanding" standard (Turner, 5 NY3d at 482; compare Gonzalez, 47 NY2d at 611; see generally Stultz, 2 NY3d at 285). Moreover, defendant's claim of ineffective assistance of appellate counsel is particularly weak here because he can identify only a single issue that was even potentially meritorious—an excessive sentence claim—that he asserts should have been included in

the appellate brief.  Given the heinous nature of defendant's violent crimes, as well as defendant's lamentable behavior and lack of remorse at sentencing, it cannot be said that appellate counsel lacked a sound, strategic reason to forgo pursuing a discretionary reduction of defendant's sentence that had "little . . . chance of success" (Caban, 5 NY3d at 152, quoting Stultz, 2 NY3d at 287).[4]

To be sure, this Court has rejected the federal rule that a defendant must show a reasonable probability that counsel's errors changed the result of the case (see Strickland, 466 US at 694).  Nevertheless, "we are not indifferent to whether the defendant was or was not prejudiced by . . . counsel's ineffectiveness" (Stultz, 2 NY3d at 283), and we have not hesitated to take prejudice into account in analyzing whether our meaningful representation standard is satisfied (see e.g. People v Heidgen, 22 NY3d 259, 279 [2013]; People v Thompson, 21 NY3d 555, 560 [2013]; People v Henry, 95 NY2d 563, 566 [2000]).  Our

---

[4] Judge Wilson correctly acknowledges that none of the circumstances allegedly arising after defendant's sentence—and, likewise, the caselaw and research cited regarding the differences between adults and children that postdated defendant's conviction—could possibly have been raised by counsel on direct appeal (J. Wilson, dissenting op at 10). Therefore, those facts and circumstances are not properly considered in determining whether appellate counsel was ineffective (see People v Henry, 95 NY2d 563, 565 [2000]; People v Hobot, 84 NY2d 1021, 1022 [1995]; People v Baldi, 54 NY2d 137, 147 [1981]); this does not suggest, however, that any such information would necessarily render appellate counsel ineffective had this appeal arisen following the development thereof. Nevertheless, Judge Wilson concludes that appellate counsel's failure to raise a claim that the sentence imposed was unduly harsh and severe, alone, amounted to ineffective assistance.  His reasoning distills to little more than an old proverb: "nothing ventured, nothing gained" (J. Wilson, dissenting op at 5).  Of course, this conflicts with the well-settled principle that appellate counsel is not required "to brief or argue every issue that may have merit" (People v Stultz, 2 NY3d 277, 285 [2004]; see Jones v Barnes, 463 US 745, 754 [1983] ["[f]or judges to second-guess reasonable professional judgments and impose on appointed counsel a duty to raise every 'colorable' claim suggested by a client would disserve the very goal of vigorous and effective advocacy"]).

holding in this case does not change any of these well-settled precepts. Here, Judge Rivera's dissent emphasizes such things as appellate counsel's inferior writing style, punctuation, pagination, and the "inexplicabl[e]" . . . insert[ion] . . . of a six-page letter from trial counsel to the judge requesting an adjournment" (J. Rivera, dissenting op at 11). That our colleagues quibble over such minuscule issues, largely exalting form over substance, is telling. Further, even their more substantive criticisms do not stand up to scrutiny. For example, Judge Rivera's dissent criticizes appellate counsel's failure to distinguish between legal sufficiency and weight of the evidence. Notably, inasmuch as the Appellate Division has authority to review both legal sufficiency and weight of the evidence, the discussion of both issues in an appellate brief directed to that Court does not demonstrate counsel's ineffectiveness. Moreover, defendant concedes that, even if the same preserved issues raised in the appellate brief filed on his behalf had been championed more effectively, they would have fared no better. Indeed, the only relief defendant sought on his error coram nobis application was the opportunity to argue that his sentence was unduly harsh and severe. Under these circumstances, we cannot conclude that the Appellate Division erred in determining that the quality of the brief did not constitute ineffective assistance of counsel (compare Gonzalez, 47 NY2d at 609-611).

Finally, insofar as defendant faults appellate counsel for failing to file a criminal leave application to this Court, such an omission does not, on its own, constitute ineffective assistance of counsel under either the Federal or State Constitutions (see People v Grimes, 32 NY3d 302, 306 [2018]; Andrews, 23 NY3d at 616). In any event, defendant does not identify any claim that should have been raised in a criminal leave application, and the only

claim he faults counsel for failing to raise in the Appellate Division—that the sentence was unduly harsh and severe—would be unreviewable by this Court (see People v Thompson, 60 NY2d 513, 521 [1983]).

In sum, because defendant was afforded meaningful representation on his direct appeal, his counsel was not ineffective under the New York State Constitution. Inasmuch as the meaningful representation standard "offers greater protection than the federal test, we necessarily reject defendant's federal constitutional challenge" (Caban, 28 NY3d at 156). Accordingly, the order of the Appellate Division should be affirmed.

People v Omar Alvarez

No. 13

RIVERA, J. (dissenting):

Our State Constitution guarantees every defendant effective assistance of counsel, which we have defined as "meaningful representation" (People v Benevento, 91 NY2d 708, 712 [1998]; People v Baldi, 54 NY2d 137, 147 [1981]; see also People v Stultz, 2

- 1 -

NY3d 277, 284 [2004] [extending the "meaningful representation" standard to appellate counsel]). In the appellate context, "[a]ppellate advocacy is meaningful if it reflects a competent grasp of the facts, the law and appellate procedure supported by appropriate authority and argument" (Stultz, 2 NY3d at 285). Defendant Omar Alvarez claims his appellate counsel's work failed to satisfy these criteria and seeks the opportunity to appeal his conviction and sentence with the benefit of a lawyer who will timely perfect the appeal, discuss the issues with him in preparing the appellate arguments, and submit a brief that advocates for him based on the facts and law rather than leaving it to the judiciary to conjure the strongest arguments on his behalf. Based on the record of appellate counsel's substandard brief and failure to comply with his basic professional obligations to his client, a de novo appeal should be granted.[1]

The majority's acceptance in this case of appellate counsel's failures erodes our constitutional standard for effective assistance, imports a prejudice standard we have long rejected, and sends a message to the profession that there is seemingly little to no value attached to a lawyer's skill in advocacy. This could not be further from the truth. I dissent.

## I.

As a threshold matter, the People's argument that defendant failed to act with due diligence in asserting his claim of ineffective assistance is unpreserved. As the People

---

[1] The brief that defendant's counsel filed on his behalf in his original appeal is available here: http://www.nycourts.gov/ctapps/reference/Alvarez%20Brief.pdf. The brief is also permanently available for viewing at the New York State Library. The Library is the repository for all court filings: http://www.nysl.nysed.gov/recbrief.htm.

concede, they argued in the Appellate Division that defendant's request for coram nobis relief should be denied on laches grounds because his failure to file his coram nobis petition earlier prejudiced the People. They did not argue, as they do now, that defendant failed to exercise due diligence in pursuing relief. In fact, the People argued that the reasons for the timing of defendant's coram nobis petition were wholly irrelevant to the court's analysis because the petition must be dismissed on the sole basis of the alleged prejudice to the People's ability to oppose defendant's request.

The People attempt to avoid our preservation rules by arguing that laches and a statutory due diligence requirement are functionally equivalent grounds for disposition of defendant's petition. The People fail to address the significant, and ultimately dispositive, differences between the two. Laches originated as a doctrine in the courts of Chancery as a ground to refuse a claim in equity by a plaintiff who delayed bringing an action beyond the limitations period, even if opposing party suffered no prejudice (see e.g. Petrella v Metro-Goldwyn-Mayer, Inc., 572 US 663, 678 [2014]; Black's Law Dictionary 1006 [10th ed 2014]). Laches remains an equitable doctrine but requires a showing of prejudice caused by a party's unreasonable delay in pursuing a right or claim. "The mere lapse of time, without a showing of prejudice, will not sustain a defense of laches" (Saratoga County Chamber of Commerce v Pataki, 100 NY2d 801, 816 [2003], cert denied 540 US 1017 [2003]). Specifically, laches is an affirmative defense, deployed to estop a party from asserting a claim (id.). As its sine qua non is prejudice to the party against whom a claim is asserted, laches may be invoked regardless of whether the action is timely or not (id.).

However, the doctrine is narrow in application and the United States Supreme Court "has cautioned against invoking laches to bar legal relief" (Petrella, 572 US at 678). In contrast, the People rely on CPL 460.30 (1), a statutory provision which extends the time to file a criminal leave application and expressly imposes a due diligence requirement on a defendant, tethered to a limitations period (CPL 460.30 [1]; People v Syville, 15 NY3d 391, 399 [2010]). In other words, by statute, the burden falls on the defendant to establish due diligence in bringing the claim within the time allotted (see People v Rosario, 26 NY3d 597, 603 [2015]; People v Arjune, 30 NY3d 347, 357–358 [2017], cert denied ___ US ___, 139 S Ct 67 [2018]). A defense based on laches and a due diligence requirement are founded on disparate analytic foundations, each imposes different burdens of production and persuasion (see, e.g., Pecorino v Vutec Corp., 6 F Supp 3d 217, 221 [EDNY 2013] ["Because laches is an affirmative defense, a defendant asserting laches bears the ultimate burden of persuasion, even where a presumption of laches may apply"]). As such, and notably, the Appellate Division would not have applied due diligence principles to the People's claim that the doctrine of laches was an insurmountable bar to his request for coram nobis relief (Lichtman v Grossbard, 73 NY2d 792, 794 [1988] [Court cannot grant relief on theory not argued below]); Karger, Powers of the New York Court of Appeals, § 17:1 at 589-591 [3d ed rev 2005]). Since the People's due diligence argument was not presented below, we may not consider it on this appeal (see Bingham v New York City Tr. Auth., 99 NY2d 355, 359 [2003]).

Even if preserved, the People's argument is without merit.[2] The People would have us extend the analysis of cases resolved under CPL 460.30 (1) and impose a statutory due diligence requirement to the writ of coram nobis. The Court has previously rejected the same claim, holding that a demand for coram nobis relief is to be considered on the merits as we do "not allow the lengthy passage of time, in itself, to bar review of a defendant's claims" (People v D'Alessandro, 13 NY3d 216, 221 [2009]). With good reason, as the writ of coram nobis is not a creature of statute, subject to the limits set by the legislature, but rather "[a] common-law writ . . . [that] continues to be available to alleviate a constitutional wrong when a defendant has no other procedural recourse" (Syville, 15 NY3d at 400, citing People v Bachert, 69 NY2d 593 [1987]). That is the case here, as defendant has no other mechanism by which to present his claim that appellate counsel was ineffective.

## II.

Turning to the merits, it is well established that a defendant has a right to effective assistance of counsel under both the federal and state constitutions (see Evitts v Lucey, 469 US 387 [1985] [defendant has federal right to appellate counsel on first appeal as of right]). We have also long recognized that our state standard affords greater protection to defendants than the federal test for ineffectiveness (People v Caban, 5 NY3d 143, 156 [2005]). Effective assistance under our state constitution requires counsel provide the client with "meaningful representation" (see Benevento, 91 NY2d at 712; Baldi, 54 NY2d at

---

[2] The Appellate Division denied defendant's petition, suggesting that it rejected the People's argument that the petition should be dismissed based on laches.

147). "[T]he claim of ineffectiveness is ultimately concerned with the fairness of the process as a whole rather than its particular impact on the outcome of the case" (Benevento, 91 NY2d at 714). This Court has stressed that "our legal system is concerned as much with the integrity of the judicial process as with the issue of guilt or innocence" (id., quoting People v Donovan, 13 NY2d 148, 153–154 [1963]). "Thus, under our State Constitution, even in the absence of a reasonable probability of a different outcome, inadequacy of counsel will still warrant reversal whenever a defendant is deprived of a fair trial" (Caban, 5 NY3d at 156).

"In Stultz, we held that the 'meaningful representation' standard, announced in People v Baldi in the context of evaluating the constitutional adequacy of trial representation, applies as well to claims of ineffective assistance of appellate counsel and that appellate counsel provides meaningful representation when [counsel] displays a competent grasp of the facts, the law and appellate procedure, supported by appropriate authority and argument" (People v Borrell, 12 NY3d 365, 368 [2009] [internal citations and quotation omitted]). The Court recognized that "[i]n delineating what is meaningful, however, it would be unwise and possibly misleading to create a grid or carve in stone a standard by which to measure effectiveness" (Stultz, 2 NY3d at 285). In other words, our "meaningful representation" standard is not static, and takes into account differences between trial and appellate advocacy. Just as trial counsel must be judged holistically by the work attendant to preparing and conducting a defense at trial (Baldi, 54 NY2d at 147), appellate counsel must be judged according to the obligations and tasks of appellate

practice, without consideration of whether the arguments presented would have resulted in a beneficial outcome for defendant (Stultz, 2 NY3d at 283). "The essential inquiry in assessing the constitutional adequacy of appellate representation is, then, not whether a better result might have been achieved, but whether, viewed objectively, counsel's actions are consistent with those of a reasonably competent appellate attorney" (Borrell, 12 NY3d at 368, citing People v Satterfield, 66 NY2d 796, 799 [1985]).

More to the point, an appellate lawyer is measured by the ability to advocate persuasively, and forcefully, if not successfully, for the client. Advocacy is "the act of pleading for or actively supporting a cause or proposal" (Black's Law Dictionary 66 [10th ed 2014]). A synonym of to advocate is to "champion" (Merriam-Webster Online Dictionary, advocate [https://www.merriam-webster.com/dictionary/advocate]). The right to counsel "means more than just having a person with a law degree nominally" representing defendant (People v Bennett, 29 NY2d 462, 466 [1972]), and requires the effective assistance of counsel in "research of the law, and marshalling of arguments on [defendant's] behalf" (Douglas v California, 372 US 353, 358 [1963]). The culmination of that work for appellate counsel is the presentation of a cogent and organized appellate argument, presented in writing, grounded on legal analysis and the facts of the case, and, when available, reaffirmed and further expounded orally before the court.

We have considered effectiveness of appellate counsel's overall performance in a small number of cases (see People v Townsley, 20 NY3d 294 [2012]; Borrell, 12 NY3d 365; People v Ramchair, 8 NY3d 313 [2007]; People v Turner, 5 NY3d 476 [2005]; Stultz,

2 NY3d 277; <u>People v Vasquez</u>, 70 NY2d 1 [1987]; <u>People v Gonzalez</u>, 47 NY2d 606 [1979]). Most of those cases focused on appellate counsel's choices, and specifically, the failure to raise a specific claim. In <u>Gonzalez</u> and <u>Vasquez</u>, the focus was on the manner in which counsel undermined their client by disparaging the client's claims; defendant's case is of a different kind. It goes to the essence of appellate advocacy – the ability to present a coherent argument intended to persuade through its rhetorical and analytical power. Here, we must consider whether merely presenting points of law without any reasoned advocacy effort is sufficient as a matter of law.

III.

Defendant filed this petition for coram nobis relief on the ground that his appellate counsel's performance, considered in its totality, deprived him of the effective assistance of counsel in his appeal. Defendant's claims are several and supported by the record.

First, defendant maintains that counsel was ineffective because he initially failed to perfect the appeal, causing the Appellate Division to place the matter on the court's Dismissal Calendar, thus risking the loss of defendant's only appeal as of right (CPL 450.10; First Department Local Rule § 1250.10). The majority does not even address this failure.

Second, counsel failed to communicate at all with his client in the three years following his appointment to represent defendant, and only as a late-day response to the Dismissal Calendar notification. Even then, the correspondence was cursory – a mere two sentence letter stating, "Enclosed please find a copy of your transcript which has been

separated from the transcript of your co-defendants'. I am presently preparing your appeal

brief and it will be submitted as soon as it has been completed." The majority concludes

that defendant's allegations are unsupported and thus fail to establish this lack of client

contact (majority op at 5-6). I disagree and conclude that appellate counsel's on-the-record

conduct supports defendant's claim.[3]

Appellate counsel waited over three years to take any action on defendant's appeal,

and only after prompted by the Appellate Division's notice of potential dismissal. Even

still, counsel's letter to defendant was nothing more than an announcement of belated work.

Its perfunctory content is telling in what it lacks. The letter does not reference prior

correspondence or communication with defendant, so it cannot be viewed as a follow-up

to prior contact. It nowhere explains why counsel is sending defendant transcripts three

years into his representation. The letter does not discuss the Appellate Division dismissal

calendar notification, even though the court copied defendant on the letter and any

reasonable attorney would expect the client to be curious or even concerned about a

---

[3] The majority claims that I have engaged in speculation about appellate counsel's years-long failure to communicate with his client (majority op at 6, n 3). The majority ignores the totality of my analysis, which focuses on several key factors: counsel's dilatory conduct was established by the Appellate Division's warning letter that defendant's appeal was at risk of dismissal for counsel's failure to perfect; counsel's hurried reaction which consisted of a cursory letter to defendant, one that lacked even a semblance of an attorney-client relationship as it failed to acknowledge any prior communication and did not explain why the appeal was noticed for the dismissal calendar; and the eventual submission of a slapdash writing that counsel had the temerity to represent as an appellate brief. If what the majority means by speculation is an unjustified assumption, then it is the majority that has faltered in its analysis by assuming that appellate counsel conducted himself in a professional manner when all evidence is to the contrary.

potential dismissal. Perhaps most revealing, counsel announces that he is working on the brief and will submit it when completed, without any suggestion of prior attorney-client discussions or the opportunity to discuss the contents of the brief, pre-filing. Of course, there is the additional matter of counsel's failure to file a request for leave to appeal to this Court when the Appellate Division affirmed his conviction.[4]

This track record is sufficient to support defendant's claims that counsel failed to communicate with defendant about the status of his appeal or otherwise engage with defendant about the issues counsel chose to raise in his brief. Counsel's failure to communicate with defendant is a basic violation of counsel's professional obligation to discuss the representation with his client, thus depriving defendant a voice in his appeal (see New York Rules of Professional Conduct – Rule 1.4 "Communication" [a lawyer shall "reasonably consult with the client about the means by which the client's objectives are to be accomplished" and "(a) lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation"]).

Third, defendant complains of the poor quality of appellate counsel's advocacy. As the record establishes, counsel took an inexplicably long time to file the brief, over four

---

[4] I adhere to the view that when, as here, appellate counsel fails to timely file a criminal leave application to this Court, the defendant has been denied effective assistance (see People v Grimes, 32 NY3d 302, 320–336 [2018] [Wilson, J., dissenting]; People v Andrews, 23 NY3d 605, 617–619 [2014] [Rivera, J., concurring in part and dissenting in part]). Defendant does not seek review in this Court, which would be the relief for that failure, but rather an opportunity for a fair consideration of his appeal in the Appellate Division. Therefore, I address the question whether appellate counsel was ineffective in his representation of defendant before the Appellate Division, the one appellate review as of right provided under New York law (CPL 450.10; People v West, 100 NY2d 23 [2003]).

years, delaying defendant's appeal. Once filed, the brief was, according to defendant, a "pathetic mockery of competent advocacy." There was no possibility any of the points raised could have persuaded the Appellate Division to reverse the conviction, and counsel's failure to raise an excessive sentence claim was inexplicable and inexcusable. Defendant submitted the brief in support of this claim.

The failings of the brief are substantial. Indeed, it is beyond understatement to declare, as the majority does here, that this "is not a model to be emulated" (majority op at 7). The brief fails to meet the basic criteria we have identified as fundamental to meaningful appellate advocacy. It does not "reflect[] a competent grasp of the facts, the law and appellate procedure" (Stultz, 2 NY3d at 285). The brief is barely 20 double-spaced pages, including separate pages for the cover, tables of contents and cases, CPLR 5531 statement, and issues presented.[5] Inexplicably, at the end of the facts section, appellate counsel inserted a photocopy of a six-page letter from trial counsel to the judge requesting an adjournment. The factual recitation consists of two pages and six lines of text. There is not a single citation in this section to the record on appeal, as required by the First Department's Local Rule § 120.8 (b)(4) which requires an appellant's brief to include a statement of facts "with appropriate citations to the . . . record." This hardly seems adequate given defendant appealed from a judgment following a three-month joint trial with two co-defendants,

---

[5] Previously, at least one member of this Court has indicated concern by a brief in a complicated case that was "only 37 pages long" (Borrell, 12 NY3d at 371, [Pigott, J., dissenting] [noting that counsel's performance in its totality was less than meaningful where "counsel's brief, which as noted by the majority was for two separate felony indictments and convictions, was only 37 pages long"]).

resulting in a trial transcript spanning over 4,000 pages, and involving multiple serious

counts, including murder. In contrast, the People submitted a brief over 175 pages long,

with 60 pages solely devoted to the facts.

Appellate counsel's brief contained four argument points. Point one is titled: "Once

the defendant is under police control was the search of the immediate area controlled by

the defendant, illegal." The argument is just barely over three pages, with several single

sentence paragraphs, and a vague reference to a "recent" case (but rather than cite or even

name the case, appellate counsel appears to cite a three-year-old law journal article without

a title). In contrast, the People responded with 15 pages of legal analysis, focused on both

defendant's standing and the merits of his claim. Point two, titled "Did the Court's denial

of an adjournment violate the defendant's 14th Amendment right of due proces [*sic*]" is a

page and a half long. The People's brief on this point was 11 pages in length, with a full

discussion of the constitutional standard. Counsel's point three, titled "Did the Court's

sealing of the witness list deny the defendant effect [*sic*] assistance of counsel" is one

paragraph long, a mere six sentences, and does not contain even a single citation to any

legal authority.[6] The People responded with five pages of argument with over 11 legal

---

[6] The entire paragraph, exactly as it appears in the brief, errors and all, reads:

> "The defendant was placed at a handicap because he was not aware who was going to testify against him for the records were sealed and the witnesses were not known until they testified.  This interfered with the ability to cross exam a witness that you were not aware of until he took the stand. There was not an opportunity to discuss the witnesses with your client before cross examination . An investigator would have been able to provide the defense attorney with background information before the witness took the stand to make his cross examination more effective . The court indicated that the witness records were sealed because there were threats, however

citations. All of the People's points in response contain thorough and repeated citations to the record. Point four, "The verdict is against the weight of the evidence" is a page and a half and, likewise, fails to contain a single citation to any legal authority. Not even to the standard of review. This is especially notable because, despite the point heading being labelled "weight of the evidence," counsel then argues there was not enough "legally sufficient" evidence. Legal sufficiency has a different, much more limited standard of review than weight of the evidence (see People v Acosta, 80 NY2d 665, 672 [1993] [comparing People v Steinberg, 79 NY2d 673, 681–682 [1992] [legal sufficiency] and People v Bleakley, 69 NY2d 490, 495 [1987] [weight of the evidence]).

The brief in no way illustrates appellate counsel's mastery of the factual record and the significant legal rules that supported these arguments (Stultz, 2 NY3d at 285). None of the points raised contain a citation to the facts or trial transcript; nowhere in the brief is the record ever cited. It appears counsel was not even certain of the standard as, for example, in support of his purported "weight of the evidence" argument, counsel invokes his personal opinion: "so I feel that the possibility of YTC setting Omar up to take the fall is very probable since they are the only ones to testify against him in the conspiracy."

The brief violates every rule about effective appellate advocacy taught to law students across the country. These rules are well-known and found in numerous academic

---

there should have been some proof that the threats came from Omar for he should not be denied his rights if the treats came from a co-defendant however there were no indication that treats came from any of the defendants. There should be a hearing before the witness list are sealed to determine whether there is justification for such a drastic action."

and practice-oriented texts used in classrooms to assist future generations of lawyers in developing the skills recognized by the profession as essential to effective appellate lawyering: (see, e.g., Mary Beth Beazley, A Practical Guide to Appellate Advocacy [4th ed 2014]; Daniel P. Selmi, Principles of Appellate Advocacy, [1st ed 2013]; Ursula Bentele, Eve Cary & Mary R. Falk, Appellate Advocacy: Principles and Practice [5th ed 2012]). One commentator summarized the skills necessary for appellate counsel as follows:

> "First, counsel must be familiar with and follow the court's rules for protecting the defendant's right to appeal, such as the rules of procedure for filing the notice of appeal and any related statements and for ordering the transcript. Second, counsel must review the record for possible appellate issues. Third, counsel must determine what issues to raise in light of the facts, the law, the standard of review, and the scope of review. Fourth, counsel must decide how to formulate those issues. Fifth, counsel must find and use the most persuasive authority available. And sixth, counsel must write persuasively – including marshalling the facts, analyzing the law, and applying it to the facts" (Griffin, Lisa. The Right to Effective Assistance of Appellate Counsel, 97 W Va L Rev 1, 37 [1994]).

Although not of the same significance, in addition to its substantive shortcomings, the brief is also riddled with grammatical and typographical errors. For example, counsel starts the brief by incorrectly identifying the parties on the cover – referring to the People as "Plaintiff-appellee," (which makes little sense in a criminal case) and referring to the defendant as both the "defendant-Appellant" and "Defendant Appellee." Point two refers in its heading to "Due Proces." The first sentence uses the contraction "it's" for the possessive. The same type of error is repeated later when the brief incorrectly refers to "defendants" in the plural rather than the singular possessive "defendant's," and uses the singular possessive "court's" when the sentence clearly intends to refer to the plural "courts." The second sentence is barely coherent: "The court in this matter appeared in the

denial of an adjournment to Omar to view the tapes and discuss them [*sic*] with his counsel prior to starting trial as if starting trial on that day was more important than the defendant being properly prepared for trial." There is also this sentence: "The defendant had to proceed to trial without adequately preparing himself with the tapes that were an obstacle he had to traverse in his defense." Ironically, the point ends with appellate counsel's assertion that a defendant has a fundamental right to an adequately prepared counsel, and it is an abuse of discretion for the court to deny defendant the opportunity to consult with counsel. If only appellate counsel had been so self-aware.

There is more. The heading for point three posits the question "did the Court's sealing of the witness list deny the defendant effect [*sic*] assistance of counsel." The argument is one paragraph long and the penultimate sentence refers to "treats" instead of "threats"—not once but twice in the same sentence. The final sentence argues about the need for a hearing "before the witness list are sealed." The point four heading refers to the weight of the evidence but in the very first sentence states that "there is not enough legally sufficient evidence to sustain a conviction on the conspiracy count."

As this summary reveals, appellate counsel's brief fails to cite cases in support of the argument, lacks appropriate discussion of the facts, fails to comply with the filing rules of the Appellate Division, and violates basic rules of syntax and grammar. To the further detriment of defendant, this was the only advocacy on his behalf presented to the Appellate Division, as appellate counsel chose to submit the appeal and did not argue in person before that court.

The majority attempts to trivialize the deficiencies in this brief and suggests that I have focused on style rather than substance (majority op at 9). The majority's fixation on the grammatical and structural errors I describe elides critique of the fundamental problems with the writing. As is obvious from my analysis, my primary concern is with appellate counsel's failure to file a brief that "reflect[ed] a competent grasp of the facts, the law and appellate procedure supported by appropriate authority and argument" (Stultz, 2 NY3d at 285). That counsel could not even proofread his brief is further evidence that he failed to meet the minimum threshold for satisfactory appellate work. For all the majority's efforts to normalize these numerous deficiencies, the majority cannot make a silk purse out of this sow's ear.

Faced with an obviously inadequate writing, the majority clings to the view that the brief satisfies our standard of meaningful representation, as long as the brief "raised four reviewable issues that "triggered plenary review by the Appellate Division" (majority op at 7). However, it is not enough for appellate counsel to raise an issue; counsel must advocate in support of the issue and serve as defendant's champion. According to the majority all appellate counsel need do to provide meaningful representation is prepare a document populated with a list of issues, unsupported by facts and law, and then leave it to the judiciary to work through the record and the law to determine whether there is a meritorious claim hidden somewhere in this substandard brief. This is not advocacy but abdication of the professional obligation to prepare a quality work product on behalf of the client.

Of course, the brief speaks for itself, and so for the reader's convenience, the brief is immediately available to view here: http://www.nycourts.gov/ctapps/reference/Alvavrez%20Brief.pdf.[7]   Practitioners, educators, and law students may assess whether this brief comports with our standard of effective legal assistance. To the organized bar, I ask: Is this an acceptable work product? Would any one of your members submit this on behalf of a client?

As for defendant's claim that appellate counsel was ineffective because he failed to challenge the sentence as harsh and excessive, I agree that on the facts of this case, there appears to be no strategic reason to fail to assert this claim. While "[e]ffective appellate representation by no means requires counsel to brief or argue every issue that may have merit [and] appellate lawyers have latitude in deciding which points to advance and how to order them," there is no hard and fast rule and counsel's representation must be measured in light of the circumstances (Stultz, 2 NY3d at 285). I would not adopt a per se rule that every appellate counsel who fails to challenge the sentence as excessive is ineffective as a matter of law. However, here, defendant's sentence was 66 2/3 years to life.  This effectively turns the minimum term of incarceration into a life sentence without the possibility of parole. Under these circumstances, there was no strategic advantage to be gained by failing to request the Appellate Division exercise its interest of justice power to consider whether defendant—who at the time of the crime was 19 years old—was

---

[7] This link is the equivalent of an appendix. It provides quick and easy perpetual access to appellate counsel's brief, which should be read as part of this dissent.

potentially redeemable and should have the opportunity to persuade the Parole Board of such in the future. After all, if paroled, defendant would still serve a lengthy sentence and would walk out of prison an old man. Still, the possibility of parole would provide him hope of spending his last days free. As Judge Wilson persuasively argues in his dissent (J. Wilson, dissenting op at 9-10), defendant's conduct during his incarceration should remind us why we cannot simply write off young people who violate the law, even those who commit heinous crimes.

The majority's conclusion that appellate counsel was effective because there is no claim upon which defendant would have prevailed ignores that, under our state standard, prejudice to defendant is "not [an] indispensable element in assessing 'meaningful representation'" (Stultz, 2 NY3d at 284; Benevento, 91 NY2d at 712; Baldi, 54 NY2d at 147). The reason is because our standard does not solely protect against errors that may have adversely affected a defendant. If that were the case, we would have adopted the federal test which requires "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different" (Strickland v Washington, 466 US 668, 694 [1984]). Instead, we have repeatedly eschewed the federal prejudice requirement because our constitution provides greater protection and is concerned with the integrity of the process overall (see, e.g., Borrell, 12 NY3d at 368; Turner, 5 NY3d at 479-480; Stultz, 2 NY3d at 283). Even if the outcome would not have changed, if counsel for the defendant fails to provide constitutionally adequate representation, our justice system

is weakened. Thus, we regard counsel as ineffective because "[o]ur focus is on the fairness of the proceedings as a whole" (Stultz, 2 NY3d at 284).

IV.

For the reasons I have discussed, the majority has reduced our constitutional guarantee of meaningful representation for defendants to nothing more than a platitude, empty of any real substance. Previously, we lauded our state standard for legal representation as affording greater protection than the federal test (Caban, 5 NY3d at 156). Now, the majority has adopted a substandard threshold for professionalism. While public defenders, legal aid attorneys, other institutional providers of indigent defense services, the American Bar Association, and our State Bar Association promote guidelines and best practices for trial and appellate counsel, the majority has chosen to accept shoddy work product as the benchmark for meaningful representation. Defendants have a constitutional right to something better and our judiciary has the obligation to maintain the high quality of legal practice in New York by rejecting inferior work.

What other profession accepts a product riddled with errors? What client would put their liberty at risk with a brief that fails to present a cogent argument grounded in the facts and the law? The answer seems plain to me that no profession and no individual would be satisfied with the work at the center of this appeal.

Defendant has established that his appellate counsel failed to provide meaningful representation as required by our State Constitution. Defendant's coram nobis petition

should be granted so that he may pursue a de novo appeal before the Appellate Division

(see, e.g., Vasquez, 70 NY2d at 4).

People v Omar Alvarez

No. 13

WILSON, J. (dissenting):

I fully join in Judge Rivera's dissent, but write separately to explain why, irrespective of the atrocious quality of appellate counsel's brief and the abject failure of appellate counsel to communicate with Mr. Alvarez, counsel's failure to ask the Appellate

- 1 -

Division to reduce Mr. Alvarez's sentence in the interest of justice was, standing alone, ineffective assistance of counsel.

I.

Our Legislature, in section 470.15 of the Criminal Procedure law, granted the Appellate Division an extraordinary power — one usually confined to the head of state: the power to reduce sentences as a matter of discretion in the interests of justice. The statute was passed in 1970 as a recodification of NY Code of Criminal Procedure § 543, which gave appellate courts that same power, though stated in a tortuous manner.[1]

Article VI of the New York State Constitution created a unique wrinkle in that authority.  In People v Speiser (277 NY 342 [1938]), we held that we, the State's highest court, lacked the power to review Appellate Division decisions reducing sentences as excessive. We explained:

> "Under this statute, the Appellate Division has complete jurisdiction to reduce the sentence imposed upon this defendant. In examining the power of this court, however, section 543 must be read in connection with sections 7 and 8 of article VI of the Constitution.  Pursuant to section 7, except where the judgment is of death or where, in civil actions, the Appellate Division, on reversing or modifying, makes new findings, our jurisdiction is limited to the review of questions of law. The

---

[1] Section 543 gave appellate courts the power to review cases in which an "erroneous judgment" had been entered "upon a lawful verdict, or finding of fact," to "correct the judgment to conform to the verdict or finding." The statute then went on to say that "in all other cases" the court must "either reverse or affirm the judgment or order appealed from or reduce the sentence imposed to a sentence not lighter than the minimum penalty provided by law."  The broadly stated "in all other cases" was interpreted to include legal but excessive judgments, giving the Appellate Division the power to declare a sentence unduly harsh and modify it accordingly (see People v Speiser, 277 NY 342 [1938]; People v Rytel, 284 NY 242 [1940]; People v Potskowski, 298 NY 299 [1948]; see also Gerhard O. W. Mueller, *Penology on Appeal: Appellate Review of Legal but Excessive Sentences*, 15 Vand. L. Rev. 671 [1962]).

provisions of section 8 which confer upon 'any appellate court' the power to modify a judgment must necessarily exclude power by this court to modify on questions of fact or discretion except in the two instances provided for in section 7. In reviewing a judgment of conviction for a misdemeanor or for a felony other than a capital offense, we can no more review the appropriateness of a discretionary sentence than the weight of evidence or other elements which do not include questions of law."

(277 NY 342, 344). Section 543 was subsequently recodified in CPL 470.15,[2] with the Appellate Division's unfettered power to reduce sentences in the interest of justice more plainly stated: "Upon an appeal to an intermediate appellate court . . . the intermediate appellate court must either affirm or reverse or modify the criminal court judgment, sentence or order. . . Upon a determination that a sentence imposed upon a valid conviction is illegal or unduly harsh or severe, the court may modify the judgment by reversing it with respect to the sentence and by otherwise affirming it."

This creates in New York a peculiar, dramatic, and powerful authority of the Appellate Division to ensure the fairness of criminal sentences, one that operates completely outside our purview. We are powerless to review the Appellate Division's exercise of that jurisdiction, and indeed we cannot even prescribe factors to be taken into account by the Appellate Division when exercising it. We can, however, review an attorney's failure to petition the Appellate Division to reduce a sentence in the interest of justice, and decide whether, in a given case, that failure falls below what a minimally competent attorney would do.

---

[2] The Court of Appeals power in the Constitution has also been recodified, moving from Section 7 to Section 3 of Article VI.

## II.

Nineteen-year-old Omar Alvarez was convicted of 9 counts of an indictment broadly charging him and others as members of a drug-dealing conspiracy known as the Yellow Top Crew, YTC, or Young Talented Children; one count was for first-degree homicide of a 14-year-old bystander. He was sentenced to 66 and 2/3 years in prison, meaning that he would be eligible for parole at the age of 87. His was, in reality, a life sentence without the possibility of parole. Indeed, at sentencing, the trial court made clear that was its goal. The court explained that Mr. Alvarez was "beyond rehabilitation" and that he "[needed] to be removed from the streets indefinitely, so that you can never return to the streets of our city[.]" The court also asked the Parole Board to "not let these defendants out. Please make them serve their maximum sentence under law[.]"

Both now and when Mr. Alvarez appealed, the People contended the points raised on appeal were meritless. What strategic reason, then, might a competent lawyer have to refrain from asking the Appellate Division to reduce the lower end of his sentence, say, to 40 years to life so that, at age 59, the Parole Board would have the opportunity to consider whether Mr. Alvarez had been rehabilitated, would not pose a danger to society if released, had been sufficiently punished, and should not continue to be imprisoned at a substantial cost to taxpayers?

Here, the People have two answers. The first is to list some reasons the Appellate Division would have denied his request. But those are not a reason to refrain from making the request: whether the argument would have changed the outcome is not the proper

inquiry (People v Borrell, 12 NY3d 365, 368 [2009]).  The question is whether counsel's choices are consistent with those of a minimally competent attorney. That question is answered by the old saw, "nothing ventured, nothing gained."

The People's second answer is that Mr. Alvarez's appellate lawyer may have made the strategic decision not to dilute his merits arguments by making a plea in the interest of justice.  That answer is particularly unsatisfactory in light of the wholly frivolous arguments counsel did raise. For example, Point 1 of the appellate brief argued the police were not permitted to search the immediate area "controlled by" Mr. Alvarez upon his arrest. Even leaving aside the argument's utter lack of merit, had Mr. Alvarez miraculously prevailed on that argument, it would have, at most, resulted in a reversal on the weapons possession charge, which, because that sentence ran concurrently with the others, would not have shortened Mr. Alvarez's prison term by a day.

III.

Because I have great faith in the commitment of the Justices of our Appellate Division to the interests of justice, I do not conclude that a request by Mr. Alvarez to reduce the minimum term of his sentence would have been doomed to failure.  Had that relief been granted, Mr. Alvarez might still have spent the rest of his life in prison if the circumstances warranted, but we would not be forced to keep him incarcerated if the circumstances sufficiently changed.

The United States Supreme Court has articulated three key differences between youthful offenders and their adult counterparts:

First, children have a "lack of maturity and an underdeveloped sense of responsibility," leading to recklessness, impulsivity, and heedless risk-taking. Second, children "are more vulnerable . . . to negative influences and outside pressures," including from their family and peers; they have limited "contro[l] over their own environment" and lack the ability to extricate themselves from horrific, crime-producing settings. And third, a child's character is not as "well formed" as an adult's; his traits are 'less fixed' and his actions less likely to be 'evidence of irretrievabl[e] deprav[ity].'"

(Miller v Alabama, 567 US 460, 471 [2012] [citing Roper v Simmons, 543 US 551, 569 [2005] [quotations omitted]). These gaps between adult and youthful offenders weaken each of the justifications for perpetual imprisonment.

"The heart of the retribution rationale is that a criminal sentence must be directly related to the personal culpability of the criminal offender" (Tison v Arizona, 481 US 137, 149 [1987]). The degree of retribution appropriate for an adult is not appropriate for youthful offenders, because the parts of the brain concerned with behavior control have not yet fully developed in them (Graham v Florida, 560 US 48, 68 [2010]). "Whether viewed as an attempt to express the community's moral outrage or as an attempt to right the balance for the wrong to the victim, the case for retribution is not as strong with a minor as with an adult" (Roper v Simmons, 543 US 551, 571 [2005]). Likewise, the state's interest in deterrence is significantly diminished when punishing a young offender, who is unlikely to be deterred by the threat of stiff punishments for transgressions (Graham, 560 US 48, 72). The state interests in incapacitation and rehabilitation are also different when dealing with young defendants, because, compared to fully-formed adults, youths have a greater capacity for change. Thus, sentencing schemes that mandate life in prison without the

possibility of parole are unconstitutional when applied to juveniles (see <u>Miller v Alabama</u>, 567 US 460, 473).

The Supreme Court made the above points with respect to juveniles under the age of 18, but that line, like all such lines, is necessarily arbitrary and cannot account for variations in the maturation of individuals. The scientific conclusions about brain development for adolescents entering adulthood present similar concerns for young adults entering their early 20's. Researchers examining brain development in the years immediately after 18 suggest that "young adulthood is a time when cognitive control is still vulnerable to negative emotional influences, in part as a result of continued development of lateral and medial prefrontal circuitry" (Alexandra O. Cohen et al., *When is an Adolescent an Adult? Assessing Cognitive Control in Emotional and Nonemotional Contexts*, 27 Psychol Sci [Issue 4] 549, 559 [Apr. 2016]). Indeed, the areas of brain development that concerned the Supreme Court in its discussion of criminal penalties for young offenders – those that govern impulsivity, risk-taking, and susceptibility to social coercion – are also those that typically develop later, including into young adulthood (Laurence Steinberg et al., *Are Adolescents Less Mature Than Adults? Minors' Access to Abortion, the Juvenile Death Penalty, and the Alleged APA "Flip-Flop,"* 64 Am Psychol [Issue 7] 583, 587 [Oct. 2009]).

Many other countries have adapted their legal systems to account for the scientific evidence. In Austria, Belgium, England and Wales, France, Hungary, Italy, Germany, Portugal, Sweden, and Switzerland, governments have put in place special rules mitigating

penalties for young adults over the age of 18 (T2A: Transition to Adulthood, *Better in Europe? European responses to young adult offending* [Mar. 2, 2015], *available at* https://www.t2a.org.uk/wp-content/uploads/2016/02/T2A_Better-in-Europe.pdf [accessed March 7, 2019]). Those rules are widespread enough, that in 2007 the United Nations Committee on the Rights of the Child "note[d] with appreciation that some States parties allow for the application of the rules and regulations of juvenile justice to persons aged 18 and older, usually till the age of 21, either as a general rule or by way of exception" (UN Committee on the Rights of the Child [CRC], General comment No. 10 [2007]: Children's Rights in Juvenile Justice, 25 April 2007, CRC/C/GC/10, *available at*: https://www.refworld.org/docid/4670fca12.html [accessed 7 March 2019]).  Although the Supreme Court's decisions, international policies, and much of the scientific research proving that young people should not be held to the same standard as adults postdates Mr. Alvarez's conviction, the Appellate Division never has been constrained to accept the proposition that sentencing a 19-year-old to life without parole (or a functionally equivalent minimum term of years) is in the interest of justice (cf. Oscar Wilde, *Children in Prison and Other Cruelties of Prison Life*, Murdoch & Co., London, 1897 at 6 ["The present treatment of children is terrible, primarily from people not understanding the peculiar psychology of a child's nature.  A child can understand a punishment inflicted by an individual, such as a parent or guardian, and bear it with a certain amount of acquiescence.

What it cannot understand is a punishment inflicted by Society.  It cannot realise what Society is"]).[3]

The Supreme Court, and indeed much of the rest of the world, considers the youth of a defendant to be an important factor when considering the appropriate punishment.  Our jurisprudence should do the same.  The majority, in contrast, does not mention Mr. Alvarez's age when he committed his crimes.

## IV.

Mr. Alvarez's life graphically illustrates why it is morally wrong to prejudge the entire future of a 19-year-old.  Mr. Alvarez has been incarcerated almost 25 years, during which time he has completed rehabilitative programs including Alternatives to Violence, Action for Personal Choice, Substance Abuse Counseling, a Pre-GED Class, Computer Technology, Computer Lab, Computer Repair, and Barber Shop training.  In those

---

[3] The majority's dismissal of these precedents and research based on their recency (majority op at 8 n. 4) conflates two very different propositions.  No research or Supreme Court decisions are necessary to conclude that an attorney with no viable merits-based arguments, representing a 19-year-old sentenced so that he will not be eligible for parole until age 87, is ineffective for failing to ask the Appellate Division to consider advancing the parole eligibility date.  Such a request might resonate with more Appellate Division Justices now than it would have decades ago, but that is a very different question.

The most interesting feature of the majority's footnote, however, is that it necessarily endorses the proposition that, given the cited Supreme Court decisions and scientific research, an attorney's failure to seek a sentence reduction in  the interest of justice where a young offender has been sentenced to a very long minimum would constitute ineffective assistance of counsel.  Otherwise, pointing out the recency of the authorities is meaningless.

programs, Mr. Alvarez has received uniformly positive reviews. He also has a positive disciplinary record.

While in prison, Mr. Alvarez has also become gravely ill. He suffers from Hodgkin's Lymphoma. His cancer was not diagnosed until it had already metastasized and caused compression around his spinal cord. As a result, Mr. Alvarez is a paraplegic. He does not have the use of his lower extremities, and he cannot control his bladder or bowels. He is wheelchair bound, in constant pain, and under full-time medical care.

Mr. Alvarez's rehabilitation as a father and husband is also extraordinary. While in prison he reconnected with Diana Alvarez, an old acquaintance; they were married in 2006. With Ms. Alvarez, he has a daughter, and he has been a loving father and stepfather to her and Ms. Alvarez's daughter from a prior relationship. Before his illness, he was able to have regular weekend trailer visits with his family, thanks to his good conduct in prison. His family is also the reason this case is even before us. It was Diana Alvarez who helped Mr. Alvarez research his appeal and discover it had concluded without his knowledge. She wishes to care for him at home.

The majority does not mention those facts. It would be worth dissenting if only to acknowledge them, but that is not my point in so doing. Of course, those facts were unknowable at the time Mr. Alvarez was sentenced, and most were unknowable at the time his appeal was denied, 4 years later. But all knew he was 19 years old when he committed his crimes. The possibility of a transformation like Mr. Alvarez's is precisely why our

system should rarely if ever sentence young people to life without some realistic opportunity to seek parole.

On this appeal, Mr. Alvarez has not asked to be granted parole. He has not even asked to be granted a chance to ask the Parole Board to consider paroling him. Instead, he has asked for permission to ask the Appellate Division what his patently ineffective counsel neglected to ask: that, while leaving the maximum life term of his sentence in place, the Appellate Division reduce the minimum 66 2/3-year term in the interest of justice, so that someday he might be able to prove to the Parole Board that both he and society would be better off terminating his incarceration short of his death. Had we granted Mr. Alvarez's coram nobis petition, allowing him to ask the Appellate Division to reduce his sentence in the interest of justice, the Appellate Division could have considered all the facts I outline above, or others. As discussed, we have no power to review the Appellate Division's exercise of its interest-of-justice jurisdiction or to limit the factors it might consider in exercising its discretion to reduce a sentence in the interest of justice. It would be entirely up to the Appellate Division to determine whether facts that occurred after Mr. Alvarez's original appeal could be considered.

## V.

A holding that the failure to seek a sentence reduction in the interest of justice automatically renders appellate representation ineffective would, contend the People, open a Pandora's Box. They are right. I advocate no such rule. The law advances one case at a time; granting Mr. Alvarez's petition would be just one of Holmes' "sybelline leaves": a

19-year-old with no viable merits-based argument, effectively sentenced to life without parole, living in a state in which the legislature has empowered its intermediate appellate Justices to live up to their titles, has a constitutional right to a lawyer who will ask those Justices for a measure of mercy, be it only the chance at age 60 to demonstrate to the satisfaction of the Parole Board that further imprisonment is unjustified. Where we draw the line can await the next case; here, the lawyer's defalcation in failing to ask for a reduction of the minimum sentence, to allow for the consideration of parole at some point within Mr. Alvarez's lifetime, is patently ineffective assistance of counsel. Were you Mr. Alvarez's lawyer, would you believe you competently represented him, as required by the ethical rules (22 NYCRR 1200.0 [Rule 1.1])? Were Mr. Alvarez your son, would you have instructed his lawyer not to ask the Appellate Division to exercise its interest of justice jurisdiction to give him the chance to prove he had earned parole? I, for one, believe he should have such a chance someday. Even poor Pandora was left, in the end, with the aid of the one deity the majority today denies Mr. Alvarez.

For the reasons expressed in Judge Rivera's dissent and here, I too dissent.

*   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

Order affirmed. Opinion by Judge Stein. Chief Judge DiFiore and Judges Fahey, Garcia and Feinman concur. Judge Rivera dissents in an opinion, in which Judge Wilson concurs in a separate dissenting opinion.

Decided March 28, 2019